THE STATE OF OHIO, APPELLEE, *v.* WERE, APPELLANT.

[Cite as *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762.]

(No. 2006–1578—Submitted February 26, 2008—Decided June 17, 2008.)

PFEIFER, J.

{¶ 1} In April 1993, inmates rioted at the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio. During the riot, inmates killed corrections officer Robert Vallandingham. In 1995, James Were, the defendant-appellant, was convicted of aggravated murder for his participation in Vallandingham's killing and sentenced to death. On appeal, this court reversed, holding that Were had been deprived of a fair trial because the trial court did not hold a competency hearing. *State v. Were* (2002), 94 Ohio St.3d 173, 176–177, 761 N.E.2d 591.

{¶ 2} In 2003, a new jury convicted Were of aggravated murder and sentenced him to death. The court of appeals affirmed. *State v. Were,* Hamilton App. No. C–030485, 2005-Ohio-376, 2005 WL 267671. This cause is now before the court upon an appeal as of right.

{¶ 3} On Sunday afternoon, April 11, 1993, a group of inmates seized control of the L-complex ("L–Block") at SOCF. The L–Block contained eight cellblocks, and each cellblock contained 80 cells. During the riot, groups of inmates overpowered prison guards and held authorities at bay for several days. Before control was regained at the prison, several inmates and Vallandingham were killed.

{¶ 4} The riot was planned and started by a group of Muslim gang members imprisoned at SOCF. Once the riot began, two other prison gangs, the Aryan Brotherhood and the Black Gangster Disciples, joined in. Carlos Sanders, Stanley Cummings, and Were—who was also known as "Namir"—were leaders of the Muslim gang during the riot. The Aryan Brotherhood, a white supremacist gang, was led by Jason Robb and George Skatzes. The Black Gangster Disciples was headed by Anthony Lavelle.

{¶ 5} After the riot started, each of the three gangs staked out separate territory within L–Block. The Muslims controlled the L–6 cellblock and stayed there for the duration of the riot. During the riot, Were wore a striped referee's

shirt, signifying that he was allowed access to any area controlled by the prisoners.

{¶ 6} As the takeover began, a group of masked inmates entered the L–1 cellblock where Vallandingham was stationed. Vallandingham had locked himself into the officer's bathroom near the front of the L–1 cellblock. Several inmates turned over a metal desk and started banging that desk against the bathroom door. Inmate Steve Macko identified Were as one of the inmates near the bathroom at this time. Eventually, Vallandingham was removed from the bathroom.

{¶ 7} Were, Sanders, and Reggie Williams, another Muslim gang member, then took Vallandingham down the corridor to the L–6 cellblock. Vallandingham was put into the L–6 shower where his hands were cuffed behind his back and a sheet was placed over his head. Vallandingham was later moved to a cell in the L–6 cellblock.

{¶ 8} Organized negotiations between the authorities and the inmates began on the second day of the riot. Additionally, on the second day, the Ohio State Highway Patrol ("OSP") installed listening devices in the large tunnels underneath L–Block. Shortly thereafter, the FBI supplied more sophisticated listening devices, which were placed in crevices at ten locations underneath L–Block. Authorities then listened and recorded inmate conversations, referred to as the "tunnel tapes," during the duration of the riot. A total of 591 "tunnel tapes" were created. Also, on the second day of the riot, the water and power were turned off inside L–Block.

{¶ 9} On April 14, the public information officer for the Department of Corrections responded to media questions about inmate threats. She stated that there had been threats and that they were a standard part of the negotiations. The inmates, who were following the news on battery-operated televisions and radios, were upset by these comments and felt that the authorities were not taking them seriously.

{¶ 10} During a meeting on April 15 that was recorded on tunnel tape 61, Were and other inmate leaders discussed killing one of the hostages to show the authorities that they meant business. Were, who described himself as a hardliner, urged others to take a firmer stand during the negotiations. Were said that the water and power must be turned back on. He continued, "We give [the authorities] a certain time * * *. If it's not on in a certain time, that's when a body goes out." Were also said, "[F]rom this point on we're turning it over to the hardliners."

{¶ 11} Before the April 15 meeting concluded, Were and the other inmate leaders voted to kill a corrections officer if their demands were not met. The Muslim inmates decided that Vallandingham would be killed because he had seen

them kill another inmate at the beginning of the riot. After the meeting, Were stated, "I'll do it, I'll do it, I'll take care of it. The hardliners is taking over. I'll take care of it."

{¶ 12} Around 9:00 a.m. on April 15, Skatzes had a telephone conversation with state negotiators. Skatzes said, "I cannot stress to you * * *. If you don't turn it on, it's a guaranteed murder. * * * That's the end of it. Do your thing at 10:30 or a dead man's out there." The inmates' demands were not met.

{¶ 13} During the riot, inmate Thomas Taylor was locked in a cell in the L–6 cellblock. On the morning of April 15, Taylor saw Were and another inmate remove Vallandingham from his cell and take him to the end of the L–6 cellblock. Around the same time, inmate Sherman Sims walked past the L–6 shower area. Were was standing at the shower door and looking into the shower. Were noticed Sims and asked what he was doing there. While this exchange took place, Sims looked into the shower and saw a man with something over his head being strangled with a rope by two people. He also saw one of them "putting a bar to [the man's] throat."

{¶ 14} Were told Sims that he would have to help carry the body out of the prison. Were directed the inmates to wrap the body in sheets. At 11:10 a.m. on April 15, Sims and three other masked inmates carried Vallandingham's body from the prison and into the recreation yard.

{¶ 15} After the body was taken into the yard, Reginald Williams, a Muslim inmate, saw Were talking to Cummings while Cummings was on the phone with the state's negotiator. Were said, "You can come get your boy * * * he's out there, and you didn't take us serious. And from this point on, * * * you'll take us serious."

{¶ 16} At 12:10 p.m. on April 15, a SWAT team recovered Vallandingham's body from the recreation yard.

{¶ 17} On April 17, Were and other inmate leaders had a meeting to discuss the progress of negotiations. This meeting was recorded on tunnel tape 32. Were argued that the hardliners should control the negotiations. During the meeting, Were said, "If everybody can recall when we first started to see improvement in here, when we sent an officer out there, that is when we started to get to see some improvement. * * * When that officer went out there, that body went out there, that is when they began to see that we is serious, because all along they said that we are not serious * * *."

{¶ 18} Were continued, "I am putting it just like this * * * if we have to throw another body, it will let people know the hardliners will put their foot down * * *. I don't give a damn you understand if some of the hostages die slow, or die at all, if I have to die, or we have to die, so I feel then if I cut off a man's

fingers, I will cut the man's hand off and go out there and say now, I am going to let you know we ain't interested in killing your hostages, they'll die slow, since you all want to play games. We is for real about what we is about, man."

{¶ 19} A short time later, Were said, "[T]hey only respect firmness. * * * I don't give a damn if it has to be on national TV, for them to see me personally, cut one of them dudes hands off and give it to them and spit it out of my mouth for them to know how serious I am about what we believe in. I don't care nothing about no electric chair, I don't care nothing about no other case * * * we got what they want and they got what we want."

{¶ 20} The riot ended on April 21, 2003, when the remaining hostages were released. Investigators then began interviewing witnesses and collecting evidence from inside the prison. No useful physical evidence linking any person to Vallandingham's murder was ever recovered.

{¶ 21} Dr. Patrick Fardal, Franklin County Deputy Coroner, conducted the autopsy on Vallandingham. Vallandingham suffered an injury to his neck that was about eight inches in length, and another abrasion about two and one-half inches long was above the primary one. Fardal testified that petechial hemorrhages on the victim's face and eyes showed that considerable force was exerted upon Vallandingham's neck. An internal exam showed that the hyoid bone and the cornu of the thyroid cartilage had been fractured by the force exerted upon the victim's neck. Vallandingham had also suffered a small chip fracture in his anterior cervical spine. Fardal concluded that Vallandingham died from ligature strangulation. Fardal did not see anything across the victim's neck that indicated a weight bar had been used to kill him though he could not rule out the possibility that such a weapon had been used.

{¶ 22} At trial, Williams testified that after the riot, he was transferred to a prison in Mansfield, Ohio. On June 23, 1993, Were and Williams were transported on a bus from Mansfield to Lucasville. As they approached Lucasville, Were looked very concerned, and Williams asked what was bothering him. Were responded, "I think they know I killed that guard."

{¶ 23} Charles Austin testified that he met Were in 2001 when they were both in prison in Youngstown, Ohio. During a conversation, Were said that he was Sanders's lieutenant during the Lucasville riot. Were then said that "he was the one who kidnapped, robbed and killed Officer Vallandingham" by strangling him. Were said that after killing him, Sanders told him to carry Vallandingham's body into the yard and leave it.

{¶ 24} On September 4, 1995, Were testified as a defense witness at the trial of Derrick Cannon, one of the Lucasville rioters. According to Mark Piepmeier, the lead special prosecutor for the Lucasville prison riot cases, Were testified that he moved from cellblock L–1 to cellblock L–6 after the riot started and remained

there for the duration of the riot. Were also indicated that he was present in cellblock L–6 when Vallandingham was murdered.

{¶ 25} During the defense case-in-chief, Thomas Blackmon, a Muslim inmate at SOCF during the riot, testified that Were had not been a leader during the riot. Blackmon said, "Nobody paid that much attention to [Were]. * * * [W]e respected him as a Muslim * * * but as far as listening to him * * * no. * * * [H]e is a good brother, but he can't read or write. * * * So he wasn't taken as serious as [Sanders], who was a bookworm and was real intelligent * * *."

{¶ 26} After the riot, Blackmon was moved from Lucasville to a succession of correctional facilities. At one correctional facility, Blackmon talked to Sherman Sims. Sims said that the OSP wanted him to say that Were was involved in Vallandingham's death. Sims said that if he did not "flip" on Were, the OSP "was going to give it to him."

{¶ 27} Blackmon also talked to Reginald Williams at Lucasville after the riot. Williams said that the OSP was messing with their food, making death threats, and he would do anything to get out of Lucasville. Williams said that the OSP told him to say that Were was involved in Vallandingham's death.

{¶ 28} Gregory Durkin, a member of the Aryan Brotherhood, testified that he sat next to Skatzes during the April 15 meeting of inmate leaders. During the meeting, Lavelle handed Skatzes a note that said the hardliners were taking over. Lavelle told Skatzes to read that message to the negotiators, and Skatzes did so. Shortly thereafter, Durkin saw Lavelle enter the L–6 cellblock with four men wearing masks and dressed in white food-service uniforms. Durkin never saw Lavelle or the other men exit the L–6 cellblock and did not know what they had done.

{¶ 29} Brian Eskridge, an inmate at SOCF during the riot, testified that he talked to Lavelle following the April 14 media comments about inmate threats. Lavelle said, "We got to kill this [corrections officer]. We got to show them that we serious about * * * our problem, we have to get this 187" (a slang term for murder). Later, Eskridge learned that Vallandingham had been killed. The next day, Lavelle had members of his security force beat Eskridge for not helping him "commit this 187."

{¶ 30} Aaron Jefferson, a member of the Black Gangster Disciples, testified that he attended meetings with Lavelle during the riot. On April 13 or 14, Jefferson had a "falling out" with Lavelle because Jefferson refused to follow Lavelle's orders about killing a corrections officer.

{¶ 31} Finally, the defense played the tape and provided the transcript of tunnel tape 60, a recording of an inmate meeting on the morning of April 16. On

the tape, the inmates discussed their grievances with the prison administration and their goals for the negotiations.

{¶ 32} During the meeting, Lavelle stated, "You must understand now where George, Robb and I, we have to concern ourselves now, with we're going to wind this thing up with our own safety, and especially with us keeping off that death row over there about that guard getting offed[.] I don't care about the inmates, cause they are going to say we did it, anyway."

## Trial Result

{¶ 33} Were was indicted on two counts of aggravated murder. Count 1 charged Were with the aggravated murder of Vallandingham with prior calculation and design. Count 2 charged Were with the aggravated murder of Vallandingham while committing kidnapping. Both counts contained death-penalty specifications for murder committed purposely and with prior calculation and design while a prisoner in a detention facility, R.C. 2929.04(A)(4), and murder committed purposely and with prior calculation and design while committing, attempting to commit, or fleeing after committing kidnapping, R.C. 2929.04(A)(7).

{¶ 34} Were had been acquitted of two additional counts at his first trial; those charges were not part of his second trial. Count 5 charged Were with the separate offense of kidnapping with a specification of a prior conviction of an offense substantially equivalent to an aggravated felony of the first degree.

{¶ 35} Were pleaded not guilty to all charges. The jury found Were guilty of all charges, and he was sentenced to death. The cause is now before this court upon an appeal as of right.

{¶ 36} *Competency to stand trial.* In propositions of law IX and X, Were argues that he was incompetent to stand trial and that the trial court's ruling that he was competent is not supported by the evidence.

{¶ 37} The trial court conducted two competency hearings. Before each of these hearings, Were refused to cooperate with psychologists sent to evaluate him. During the first competency hearing, Alan Barr, a correctional-program specialist at Lebanon Correctional Institution, testified as a state witness. Barr had numerous contacts with Were in prison. He testified that Were was always responsive and that Were understood the rules and regulations of prison life. Marva Allen, the manager of the isolation unit at Lebanon, testified that Were presented lucid arguments when talking about his rights and privileges and that he had never exhibited any bizarre thought patterns or behavior during their discussions.

{¶ 38} During the first hearing, the defense presented the testimony of three inmates: Daniel Coleman, Danny Grant, and John William Harris. Coleman assisted Were with adult education courses he was taking in prison. All three

witnesses helped Were with his legal paperwork. They testified that Were had difficulty comprehending information and that explanations had to be repeated to him. Grant and Harris testified that they prepared legal motions for Were, and he would then copy them in his own handwriting.

{¶ 39} The defense also introduced the transcript of the hearing on Were's motion to dismiss counsel at his first trial. During that hearing, Were asserted a breakdown in communications, accused his counsel of trickery, and claimed that his counsel would not do what he asked. According to John Mackey, one of Were's attorneys at his first trial, Were believed that his counsel were in league with the state, and he would not talk to them. Mackey opined that Were suffers from paranoia. The defense also presented a collection of motions, pro se motions, and journal entries pertaining to Were's problems in cooperating with his attorneys during his first and second trials.

{¶ 40} The trial court ruled that Were was competent to stand trial. The trial court found that Were understood the nature and character of the charges against him and that he was capable of assisting counsel in his defense "if he wishes to do so."

{¶ 41} Less than two months later, the defense filed a new suggestion of incompetency. During the second competency hearing, Jacalyn McCullough, a teacher with the Ohio State Penitentiary, testified for the defense. Were had attended classes taught by McCullough for over a year while he was an inmate at the Ohio State Penitentiary in Youngstown. She testified that Were's reading was at a fourth- or fifth-grade level and that his math skills were at a third-grade level. Were was unsuccessful in moving to a pre-General Educational Development ("GED") curriculum because he could not perform at a sixth-grade level. McCullough believes that if Were were in a normal school setting, he would be considered developmentally handicapped.

{¶ 42} Dr. David Hammer, a clinical psychologist, also testified for the defense. Hammer believed that Were was mildly mentally retarded and was not competent to stand trial. Hammer believed that Were's intellectual limitations would "make it very difficult for him to * * * confer with his counsel for the defense." Hammer's competency opinion was based on Were's cognitive limitations and his demonstrated pattern of paranoid thinking. Hammer's findings on Were's cognitive limitations were based on Were's IQ test scores of 69 when he was seven and 12 years old and McCullough's testimony that Were's reading comprehension was at the third-grade level. Hammer did not personally evaluate Were because Were refused to meet with him.

{¶ 43} The defense also presented Were's school records. These records show that Were did poorly in school and had an IQ of 69.

{¶ 44} After the second hearing, the trial court again ruled that Were was competent to stand trial. In reviewing the evidence, the trial court stated that McCullough's testimony dealt with his intelligence level, not his competency. The trial court found that Hammer was not believable based on observing his testimony, his background (noting that Hammer failed his test for licensing in Ohio the first time), and how he arrived at his conclusions. The trial court also noted that Hammer did not interview Were.

{¶ 45} The test for determining whether a defendant is competent to stand trial is " 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, quoting *Dusky v. United States* (1960), 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824. A defendant is presumed to be competent to stand trial, and the burden is on the defendant to prove by a preponderance of the evidence that he is not competent. R.C. 2945.37(G); *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28.

{¶ 46} A trial court's finding that a defendant is competent to stand trial will not be disturbed when there is some reliable and credible evidence supporting those findings. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33; *State v. Williams* (1986), 23 Ohio St.3d 16, 19, 23 OBR 13, 490 N.E.2d 906. Deference on these issues should be given "to those who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

{¶ 47} Were contends that the trial court's findings are flawed because testimony established that he could not understand and cooperate with his lawyers because of his paranoid distrust of them. But Were's paranoid behavior does not undermine the trial court's findings of his competence to stand trial. See *Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 25–29. As noted in *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016, "[i]ncompetency must not be equated with mere mental or emotional instability or even outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel."

{¶ 48} Were argues that his paranoia was exacerbated because he is also mentally retarded. The trial court, however, made findings during a later portion of the trial that Were was not mentally retarded. Even assuming that these findings are incorrect, "[m]entally retarded persons frequently * * * are competent to stand trial." *Atkins v. Virginia* (2002), 536 U.S. 304, 318, 122 S.Ct. 2242, 153 L.Ed.2d 335. Thus, we reject this claim.

{¶ 49} Finally, Were argues that the trial court erred by disregarding Hammer's unrebutted expert testimony that Were was incompetent. *State v. Brown* (1983), 5 Ohio St.3d 133, 5 OBR 266, 449 N.E.2d 449. In *Brown,* three expert witnesses testified that the defendant met the criteria for legal insanity and three lay witnesses recounted the defendant's bizarre behavior during the relevant time period. Id. at 133–134, 5 OBR 266, 449 N.E.2d 449. The trial court found the defendant sane even though the state offered no rebuttal testimony indicating that the defendant was sane. Id. at 134, 5 OBR 266, 449 N.E.2d 449. We disagreed, holding that the trial court arbitrarily ignored expert testimony that the defendant was insane. Id. at 135, 5 OBR 266, 449 N.E.2d 449. Unlike *Brown,* the state in this case presented two witnesses testifying to Were's competency. Further, the trial court specifically concluded that Hammer's conclusions were not "believable." *Brown* does not control our conclusion on this issue.

{¶ 50} We also consider our recent decision in *State v. White,* 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, in resolving this issue. In *White,* both the state's and the defense's experts concluded that White was mentally retarded. Id. at ¶ 29. The state also presented testimony from White's girlfriend, who testified that he worked and rented an apartment, and could cook, drive, and play games that required coordination. Id. at ¶ 27. After considering the evidence, the trial court found that White had failed to prove by a preponderance of the evidence that he had significant limitations in two or more adaptive skills or "onset before the age of 18." Id. at ¶ 33. Based on these findings, the trial court ruled that White had failed to establish that he was mentally retarded. Id.

{¶ 51} The trial court in *White* rejected the experts' conclusion because it questioned the manner in which the experts administered and scored the Scales of Independent Behavior—Revised ("SIB–R"), which measures adaptive skills. Id. at ¶ 35. The trial court also found that the testimony of White's girlfriend was inconsistent with retardation. Id. at ¶ 39. We held that the trial court abused its discretion when it determined that White had failed to prove the existence of significant adaptive-skills limitations. Id. at ¶ 48. We concluded that the trial court had improperly disregarded expert opinion in reaching its findings and had overly relied on the girlfriend's observations. Id. at ¶ 71–72. We also noted that the trial court made no findings that the experts lacked either credentials or credibility. Id. at ¶ 73.

{¶ 52} The trial court in this case found that Dr. Hammer's expert opinion on competency was not credible based on "his education, his experience, and * * * how he arrived at his opinions." The trial court's own observations of the defendant supported its conclusion that Were was competent to stand trial. Dr. Hammer testified that Were was incompetent because of his inability to cooper-

ate with his counsel. That conclusion is undermined by several in-court statements made by Were and by the pro se motions filed by Were before the second competency hearing was completed. We conclude that the trial court could properly find that Were was capable of communicating with his lawyers when he wanted to do so. See *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 237, 714 N.E.2d 867 (trial court's own observations of defendant and testimony of correctional officers showed that competency determination was not arbitrary).

{¶ 53} We hold that the trial court did not abuse its discretion in finding that Were was competent to stand trial. The trial court's findings were based on the state's two witnesses, consideration of the defense evidence, and its own observations of the defendant. Thus, reliable and credible evidence supports the trial court's decision. We reject propositions of law IX and X.

{¶ 54} ***Disqualification of the trial judge.*** In proposition of law XXV, Were contends that he was deprived of a fair and impartial judge because the judge also presided at the trial of a codefendant, Carlos Sanders. Because of the likelihood of bias, Were argues that the trial judge should have recused himself.

{¶ 55} During pretrial proceedings, Were addressed the court and asserted that the trial judge was prejudiced because he had been the judge at Sanders's trial. Were said he asked his counsel to file a motion to remove the sitting judge from his case. Trial counsel did not request the judge to recuse himself or file an affidavit of disqualification.

{¶ 56} Under R.C. 2701.03(A), when a party believes that the trial judge is biased, the proper avenue for redress is the filing of an affidavit of disqualification. See Section 5(C), Article IV, Ohio Constitution. "An affidavit of disqualification must be filed as soon as possible after the incident giving rise to the claim of bias and prejudice occurred or affiant becomes aware of circumstances that support disqualification. A party may be considered to have waived its objection to the judge when the objection is not raised in a timely fashion and the facts underlying the objection have been known to the party for some time." *In re Disqualification of O'Grady* (1996), 77 Ohio St.3d 1240, 1241, 674 N.E.2d 353. Because Were failed to file an affidavit of disqualification against the trial judge, he waived his complaint.

{¶ 57} Were's allegations also lack merit. Were presents no evidence of judicial bias other than the trial court's previous participation as the judge at a codefendant's trial. A trial judge is not disqualified simply because he acquired knowledge of the facts during a prior proceeding. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 188, 616 N.E.2d 909. We reject proposition XXV.

{¶ 58} ***Batson challenges.*** In proposition of law XXVIII, Were asserts that the prosecutor peremptorily challenged two African–American prospective jurors

because of their race, in violation of his equal-protection rights under *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 59} Initially, the state argues that this issue is moot because the two African–American jurors who were peremptorily challenged were alternate jurors who were never called upon to deliberate on the case. This same argument was rejected in *United States v. Harris* (C.A.6, 1999), 192 F.3d 580, 587–588. *Harris* held that alternate status is "irrelevant" to a *Batson* analysis because "the harm inherent in a discriminatorily chosen jury inures not only to the defendant, but also to the jurors not selected because of their race, and to the integrity of the judicial system as a whole." Id. Thus, this argument lacks merit.

{¶ 60} Moreover, Were did not raise his *Batson* claim in the court of appeals. He has therefore waived the issue absent a showing of plain error. *State v. Phillips* (1995), 74 Ohio St.3d 72, 80, 656 N.E.2d 643; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus; see Crim.R. 52(B).

{¶ 61} " 'A court adjudicates a *Batson* claim in three steps.' *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69. * * * Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. Id. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. See also *Purkett v. Elem* (1995), 514 U.S. 765, 767–768, 115 S.Ct. 1769, 131 L.Ed.2d 834. A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395." *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106.

{¶ 62} During the selection of alternate jurors, the prosecutor peremptorily challenged two African–American prospective jurors, West and Mitchell. Were's counsel objected to the state's peremptory challenge of both jurors as a *Batson* violation.

{¶ 63} During voir dire, West had stated, "I don't believe I could" join a death verdict. West continued, "I would feel funny about it. I just, it is just me. * * * I don't want to sentence anybody like that." After further questioning, West stated, "If I have to do it, I would do it." West's equivocal answers conveyed uncertainty about her ability to vote for the death penalty.

{¶ 64} The prosecutor stated that he peremptorily challenged West because she said she had no opinion on the death penalty on her questionnaire. He also

stated, "When she was [questioned] by the Judge, it became very apparent that, in fact, she opposed the death penalty. Initially, it was almost like she couldn't even pass the *Witherspoon* [*v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776] test, but the Judge asked her and got her qualified. But it was obvious that she had serious problems with the death penalty."

{¶ 65} Uncertainty about how a prospective juror perceives the death penalty is a "race-neutral reason" for exercising a peremptory challenge against her. See *State v. White* (1999), 85 Ohio St.3d 433, 437, 709 N.E.2d 140. The trial court concluded that the prosecutor had "asserted a race-neutral reason for [the] exercise of the peremptory" challenge and rejected the *Batson* challenge. We find no plain error.

{¶ 66} The prosecutor provided the following race-neutral explanation for peremptorily challenging prospective juror Mitchell:

{¶ 67} "First of all, Judge, just to make this short, I'll adopt everything that I said with regard to [West] because the same facts apply here. There is no opinion on the questionnaire, but when questioned by the Judge, it was obvious that she had some death penalty feelings.

{¶ 68} "We think that we're entitled to a jury that will fairly consider the death penalty. We don't believe that she's one. That's our reason for excusing her."

{¶ 69} Trial counsel challenged the state's explanation and asserted, "[T]his is now the third African–American woman being excused from this jury. We think that it is a systematic exclusion of African–Americans * * *." In reply, the prosecutor stated, "This jury contains two black females and one black male. We have exercised our peremptories to excuse * * * three white people and three black people. We have done it because we felt that the people couldn't give us a fair jury." The trial court rejected the *Batson* challenge and found that the "prosecutor has laid out a race-neutral reason for the excuse of Ms. Mitchell."

{¶ 70} We conclude that no plain error was committed. Mitchell's answers about the death penalty in her questionnaire and during voir dire conveyed some uncertainty about her position on the death penalty. Mitchell's juror questionnaire shows that when asked, "What is your opinion concerning Capital Punishment[?]" Mitchell checked the block stating "no opinion." During voir dire, Mitchell was asked for her views about capital punishment:

{¶ 71} "Q (trial court): [I]f the facts * * * would call for [the death penalty] and the law that would be given to you would permit it, could you join in a verdict with your other jurors knowing that your decision could result in the death of Mr. Were, the defendant?

{¶ 72} "A: Yes, I think I could.

{¶ 73} "Q: You think you could?

{¶ 74} "A: Yes."

{¶ 75} Other facts also point away from a racial motivation. The jury included two female and one male African–American jurors. Moreover, the state did not use two peremptory challenges that were available before the jury was selected. The presence of African–Americans on a jury certainly does not preclude a finding of discrimination, but "'the fact may be taken into account * * * as one that suggests that the government did not seek to rid the jury of persons [of a particular] race.'" *White,* 85 Ohio St.3d at 438, 709 N.E.2d 140, quoting *United States v. Young–Bey* (C.A.8, 1990), 893 F.2d 178, 180.

{¶ 76} We conclude that Were has failed to demonstrate that the trial court committed plain error by overruling his *Batson* claim. We therefore overrule proposition of law XXVIII.

{¶ 77} *Restrictions on voir dire.* In proposition of law XXXI, Were argues that the trial court improperly restricted defense questioning during voir dire examination. Were did not raise this claim in the court of appeals and therefore waived all but plain error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 78} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212. "Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire." *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 28.

{¶ 79} Were asserts that the trial court unduly limited his counsel's efforts to identify prospective jurors who could not reasonably follow the law and consider the evidence during both phases of the proceedings. Were's claim is not supported by the record. Voir dire took four days and encompasses nearly 800 pages of transcript. Trial counsel were given extensive leeway in examining jurors about their willingness to consider the evidence, follow the court's instructions, and impose a life sentence.

{¶ 80} Were claims that the trial court precluded the defense from asking excused juror Lingo and seated juror Copeland about mental retardation. The trial court did not permit Lingo to be questioned about his willingness to consider mental retardation as a mitigating factor. Parties in a capital case are not entitled to ask about specific mitigating factors during voir dire. *State v. Jones* (2001), 91 Ohio St.3d 335, 338, 744 N.E.2d 1163. The trial court precluded Copeland from answering a question about the minimum age for imposing the death penalty. This question is not relevant to mental retardation.

{¶ 81} Were also argues that the trial court improperly precluded questioning about the burden of proof in the sentencing phase. During voir dire of Lingo,

trial counsel stated, "[I]f he was convicted * * * they're still going to have to prove * * * that the aggravating circumstances outweighed the mitigating." The trial court interrupted counsel and said, "He doesn't even know what an aggravating circumstance is, what is going to outweigh a mitigating factor. * * * You can't have him answer it." The trial court exercised appropriate discretion. Indeed, "weighing aggravating circumstances against mitigating factors is a complex process. * * * Realistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304.

{¶ 82} Next, Were claims that the trial court erred by not permitting trial counsel to mention that the defense could not offer plea bargains to inmate witnesses, as the prosecution could. During voir dire of seated juror Erndt, the trial court sustained the state's objection to trial counsel's statement, "I can tell you, by the same token, that the witnesses for the defense are basically going to be convicted felons who were inmates at Lucasville at the time of the riot. * * * I can also promise you that the defense witnesses didn't get any plea bargains in return for their testimony." Trial counsel was not asking a question but making a statement about witness credibility. Also, there was no prejudice because counsel later asked Erndt if she could judge credibility based upon the witnesses' bias and motive to lie.

{¶ 83} Were also contends that the trial court erred by not allowing trial counsel to ask excused juror Garrett and excused alternate Smith whether they would vote for death if Were were found guilty of intentional murder. During Garrett's voir dire, the trial court did not allow trial counsel to ask, "So what we want to know is if you have made that determination, * * * that there was an intentional killing * * * in a prison facility, I don't need to hear any more—death penalty?" Garrett had previously expressed her willingness to consider the facts, follow the judge's instructions, and consider all sentence options. Thus, the trial court could limit repetition of the same type of questions.

{¶ 84} The trial court curtailed questioning of Smith about imposing the death penalty for an intentional killing because "he doesn't know what an intentional killing is. * * * That's a legal definition." No possible prejudice resulted because the trial court rephrased the question, and Smith stated that he would not automatically vote for the death penalty and would consider life-sentence options if Were were found guilty as charged.

{¶ 85} Finally, Were complains that the trial court improperly precluded the defense from asking seated jurors Birri and Nie about procedural issues. The trial court did not allow counsel to discuss the differences between grand jury and trial procedures with Birri, who had previously served on a grand jury. The

trial court also did not allow counsel to inform Nie that the jury would be conducting a jury view of the Lucasville prison. The trial court acted properly in each instance because the subject matter of such questioning was outside the scope of voir dire. See *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674.

{¶ 86} We find that the trial court committed no plain error in restricting trial counsel's questioning during voir dire. Thus, we overrule proposition of law XXXI.

{¶ 87} *Jury view.* In proposition of law XXXII, Were argues that the trial court violated his due-process rights by not allowing him to be present at the jury view of the crime scene. Were did not raise this claim in the court of appeals and has therefore waived all but plain error. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus; see Crim.R. 52(B). In a pretrial motion, the defense requested that the court grant a jury view of the crime scene at the prison. In ruling on the motion, the following exchange occurred:

{¶ 88} "The court: Would your client waive his presence?

{¶ 89} "The defendant: Well, I'd like to be present so I can share a thought with my attorneys about the situation down there. They might like—

{¶ 90} "The court: I won't grant that view of the scene if you want to be present.

{¶ 91} "Ms. Agar (defense counsel): My understanding is if you—if that's the only way we can have the view of the scene, you're willing to waive your presence, is that correct, in order for the jury to be able to see the scene?

{¶ 92} "The defendant: Yeah, if that's the only way.

{¶ 93} "The court: That's the only way, if you waive your presence.

{¶ 94} "All right. The record will show the defendant has waived his presence at the view of the scene."

{¶ 95} R.C. 2945.16 provides: "When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body * * * to such place, which shall be shown to them by a person designated by the court. * * * The accused has the right to attend such view by the jury, but may waive such right."

{¶ 96} Were challenges the validity of his waiver because the trial court compelled the waiver as a condition of holding the jury view. He argues that such waiver is improper because his presence was a constitutionally protected right. Although Were has a statutory right to be present at the jury view, he does not have a constitutional right to be there. In *Snyder v. Massachusetts* (1934), 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674, the Supreme Court held that denial of a defendant's presence at a jury view did not violate due process. The

*Snyder* court recognized that "the presence of a defendant [in a felony prosecution] is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Id. at 107–108, 54 S.Ct. 330, 78 L.Ed. 674.

{¶ 97} We conclude that the trial court did not commit plain error in granting the defense request for a jury view conditioned on Were's agreement to waive his presence. Were waived his right to attend the jury view in open court and in the presence of counsel. Moreover, trial counsel did not object to Were's waiver of his presence as a condition to the jury view.

{¶ 98} In addition, Were cannot show that he was materially prejudiced by his absence from the jury view. His counsel were present, and there is no indication in the record that anything improper occurred at the jury view. Were told the trial court that he wanted to attend the jury view to tell his attorneys "about the situation down there," but he did not explain how his presence at the scene would have provided his attorneys with information that they could not have gained by consulting Were before or after the visit. See *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 70 (holding that a trial court's refusal to allow the defendant to attend the jury view was not prejudicial). Based on the foregoing, we reject proposition of law XXXII.

{¶ 99} In proposition of law XXIX, Were argues that he was denied a fair trial because the trial judge went on the bus with the jury when they visited the prison. Were did not object at trial to the judge's decision to ride on the bus and thereby waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. Were also did not raise this argument in the court of appeals and waived this claim but for plain error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 100} No plain error occurred. On the day before the jury view, the trial court discussed the arrangements with the jurors for the two and one-half hour bus ride to Lucasville. Outside the presence of the jury, the judge later stated, "I am going to go on the bus and I'll bring reading material." No further mention about the bus ride appears in the record.

{¶ 101} Were asserts that he was denied a fair trial because of the likelihood of unauthorized communications between the judge and the jurors during the long bus ride. There is no evidence, however, of any improper communications between the judge and jury during the bus ride or the jury view. Accordingly, we reject proposition of law XXIX.

{¶ 102} ***Stun belt.*** In proposition of law XXVI, Were contends that the trial court erred by requiring him to wear a stun belt without first conducting a hearing to justify the use of this restraint. In a pretrial motion, Were requested

to appear at all proceedings without restraints. The trial court granted the motion to appear without restraints but allowed the use of a stun belt. The record does not show that the court heard evidence to justify the use of the stun belt, and the court did not state its reasons for allowing its use.

{¶ 103} A trial court can require the use of stun belts when the prosecution justifies their use on the record. *State v. Johnson,* 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 242. The defense did not object to the trial court's ruling permitting a stun belt and did not request a hearing on the matter. Failure to object waived the error, requiring the defendant to show that he was prejudiced by wearing the belt. Id. at ¶ 247.

{¶ 104} In pro se filings, Were complains that he was required to wear a stun belt throughout the trial. Were does not claim that the device caused him any physical discomfort or interfered with his ability to communicate with counsel. Moreover, the record contains no indication that the jury knew or could see that Were was wearing a stun belt. Accordingly, we find that defendant was not prejudiced, and overrule proposition of law XXVI.

{¶ 105} *Admissibility of tunnel tapes.* In proposition of law XVIII, Were argues that the trial court erred by overruling the defense motion to suppress the tape recordings of inmate conversations ("tunnel tapes") that the FBI recorded during the riot. On April 13, 1993, FBI Agent Marc Hopper installed small microphones in the tunnels underneath L–Block to monitor and record inmate conversations. Were's discussions with inmate leaders were recorded on April 15 and April 17. No warrant was ever issued for the interception of these conversations.

{¶ 106} Were argues that the state was not allowed to intercept the inmates' conversations without obtaining advance consent from some party to the interception or obtaining a warrant as required by former R.C. 2933.51 et seq., Am.Sub. S.B. No. 222, 141 Ohio Laws, Part I, 457. We rejected the same claim in *State v. Robb* (2000), 88 Ohio St.3d 59, 65–66, 723 N.E.2d 1019, another case stemming from the Lucasville riot.

{¶ 107} *Robb* held that federal, not state, law controlled the legality of the intercepts. Id. at 66, 723 N.E.2d 1019. FBI agents, acting under the authority of federal law, installed and monitored the electronic interception and recording devices that were used inside the prison. We explained that "[f]ederal law explicitly defines 'oral communications' as only those 'exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation.'" Id. at 66–67, 723 N.E.2d 1019, quoting Section 2510(2), Title 18, U.S.Code. We explained that the rioting inmates had no expectation of privacy in their cells. Id. at 67, 723 N.E.2d 1019. Based on *Robb,* we conclude that the conversations of the rioting inmates introduced during

Were's trial were not "oral communications" entitled to protection under federal law. Accordingly, proposition of law XVIII is overruled.

{¶ 108} *Admissibility of inaudible tapes, transcripts, and hearsay.* In proposition of law XIX, Were argues that the trial court erred by admitting inaudible tapes of discussions between Were and inmate leaders and by permitting the jury to receive transcripts of those tapes. He also claims that the tapes and transcripts contained inadmissible hearsay. Were argues that the trial court should not have admitted the audiotapes because they were inaudible and could not be understood without the transcripts. Highway Patrol Sergeant Howard Hudson described tunnel tape 61, which recorded the April 15 meeting, as being of poor quality: "There's a lot of clanging and banging in the background. But as far as the voices, most of what is on there can be intelligible." Hudson testified that tunnel tape 32 is "a little clearer * * * [but] these tapes contain a lot of background noise that requires a lot of intense listening to make out what's being said." Over defense objection, the trial court admitted the tapes.

{¶ 109} To be admissible, a tape recording must be authentic, accurate, and trustworthy. *State v. Rogan* (1994), 94 Ohio App.3d 140, 148, 640 N.E.2d 535. The decision to admit tape recordings that are partly inaudible is a matter within the sound discretion of the trial court. *State v. Coleman* (1999), 85 Ohio St.3d 129, 141, 707 N.E.2d 476. Snodgrass, who was present at the April 15 meeting, authenticated tunnel tape 61 and interpreted its contents. Williams authenticated tunnel tape 32. Were had full opportunity to cross-examine Snodgrass and Williams about the conversations on the tapes. Under these circumstances, the trial court did not abuse its discretion in admitting the tapes despite the background noises and disjointed and multiple conversations. Moreover, we held that the same audiotapes were admissible in *Robb*, 88 Ohio St.3d at 72–73, 723 N.E.2d 1019.

{¶ 110} Were also argues that the trial court erred by allowing the jury to use transcripts as an aid in listening to the tunnel tapes. Hudson testified that state's exhibits 6–A and 8–A are "fair, true and accurate copies of what is being said on the tape." Hudson testified that investigators and prosecutors listened to the tapes and prepared the transcripts. Inmates Snodgrass, Williams, and David Lomache identified the voices on the tapes when the transcripts were prepared. The preparation of the transcripts was an ongoing, lengthy process that occurred throughout the investigation and the other hearings and trials.

{¶ 111} Trial counsel objected to the transcripts, state's exhibits 6–A and 8–A, and argued that the transcripts did not accurately reflect what was said on the tapes. After the defense objection, the trial court had the court reporter listen to the tapes and prepare another transcript of them. The court reporter spent the weekend transcribing the tapes. On the following Monday, the court reporter

stated that due to time constraints and equipment problems, she was unable to complete an accurate transcription of the tapes.

{¶ 112} Following his discussion with the court reporter, the trial judge ruled that state's exhibits 6–A and 8–A could be used as listening aids. The trial court also stated that the jury would be instructed that the "evidence consists of the tapes themselves. The transcripts are provided to you only for the purpose of helping you understand the tapes, if you find they do help you. If you find there is a difference or discrepancy between the transcript and the tapes, you are to rely only on the tapes." Such instructions were provided to the jury when they were presented with the tapes and transcripts.

{¶ 113} "Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." *State v. Waddy* (1992), 63 Ohio St.3d 424, 445, 588 N.E.2d 819, quoting *State v. Holmes* (1987), 36 Ohio App.3d 44, 50, 521 N.E.2d 479. Moreover, providing a jury with a transcript as a listening aid is permissible when the trial court instructs the jury, as it did in this case, that the transcript is not evidence. *State v. Mason* (1998), 82 Ohio St.3d 144, 159, 694 N.E.2d 932.

{¶ 114} Hudson's testimony established that the transcripts are fair and accurate renditions of the conversations on the tapes. The trial court repeatedly instructed the jury that the tapes were evidence and the transcripts were not. Were's claim that there are material differences between the tapes and transcripts is not substantiated. He contends that there are differences because the transcripts have been constantly changed over a ten-year period of time, but he fails to identify any of those differences. We conclude that this claim lacks merit.

{¶ 115} Finally, Were argues that the trial court erred in admitting the two tunnel tapes, state's exhibits 6 and 8, and a negotiation tape, state's exhibit 7, because the inmate discussion on the tapes was hearsay. Were did not raise this issue in the court of appeals, and therefore waived all but plain error. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 116} Under Evid.R. 801(D)(2)(e), hearsay does not include a statement offered against a party that is made "by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." "The statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus. Evid.R. 802(D)(2)(e) does not require that explicit findings of the conspiracy be made on the record.

{¶ 117} The prosecution established that the Lucasville takeover involved a major conspiracy by inmate gang leaders. Williams testified about the takeover

of L–Block, the kidnapping of Vallandingham, the inmate gangs involved in the riot, and the identities of the gang's leaders, including Were. Hudson provided an in-depth overview of the riot and described how the leaders of three gangs were jointly involved during the negotiations. Thus, Hudson's and Williams's testimony provided the required preliminary prima facie showing of the conspiracy. Moreover, we held that similar testimony established such a conspiracy in *Robb*, 88 Ohio St.3d at 69, 723 N.E.2d 1019, and in *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 102–103. We reject proposition of law XIX.

{¶ 118} *Defense's excluded evidence*. In proposition of law XX, Were argues that the trial court erred by excluding Aaron Jefferson's testimony that Lavelle attempted to recruit Jefferson to kill Vallandingham. Were also argues that the trial court erred by excluding a negotiation tape that contained police discussions about Lavelle's role in the riot.

{¶ 119} 1. Lavelle's statements. During the defense case, Jefferson, a member of the Black Gangster Disciples, testified that Lavelle approached him about killing a corrections officer during the riot. The trial court sustained the state's objection when trial counsel asked Jefferson to explain what Lavelle had said to him.

{¶ 120} At the conclusion of the defense case, trial counsel proffered the excluded testimony:

{¶ 121} "Mr. Wenke (defense counsel): Judge, I have one other proffer that I wanted to make * * * and that was in regard to the witness, Aaron Jefferson.

{¶ 122} " * * *

{¶ 123} "The statement would have been from Lavelle, that he approached Aaron Jefferson and asked him about killing a CO [corrections officer] because of the spokesperson. He wanted him to be the BGD killer, which is Black Gangster Disciple. He refused.

{¶ 124} "A few hours later, he heard the announcement of the death. Lavelle would have been in charge of getting rid of the bloody clothes and weapons and giving fresh clothes and that he was going to burn the evidence."

{¶ 125} The prosecutor informed the trial court that "Lavelle is up at Warren right now. I could have him down here at 1 o'clock." The defense did not respond to the prosecutor's offer, and Lavelle was not called as a witness.

{¶ 126} Were argues that Jefferson's excluded testimony was admissible as statement against penal interest under Evid.R. 804(B)(3). In order for a declarant's statement to qualify as an Evid.R. 804(B) exception to the hearsay rule, it must first be shown that the declarant is unavailable as a witness. See *State v. Issa* (2001), 93 Ohio St.3d 49, 58, 752 N.E.2d 904; *State v. Burke* (1995),

73 Ohio St.3d 399, 403, 653 N.E.2d 242. Were does not claim, and nothing in the record indicates, that Lavelle was unavailable as a witness. Indeed, the prosecutor informed the court that Lavelle could be brought to court that afternoon. Accordingly, Jefferson's testimony about what Lavelle said to him was properly excluded.

{¶ 127} Were also argues that the exclusion of Lavelle's statement denied him the due-process right to present a defense. This argument has no merit. At most, the excluded testimony showed that Lavelle wanted Jefferson to murder Vallandingham, but Jefferson refused to follow Lavelle's orders. Thus, the excluded testimony provides no evidence that another person might have killed Vallandingham.

{¶ 128} 2. Negotiators' audiotaped discussions. Were argues that the trial court erred by excluding police discussions about Lavelle's role that were recorded on a negotiation tape. This issue was not raised in the court of appeals; therefore, this claim is waived absent plain error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 129} Inmate Skatzes's April 15 telephone conversation with police negotiators on negotiation tape 6 was presented during the state's case. During Hudson's cross-examination, trial counsel sought to play negotiation tape 6 in its entirety, including internal discussions among the police about the Muslims and Lavelle. Trial counsel stated that the police comments show that Lavelle was the person referred to as the hardliner on the tunnel tapes. The excluded comments include "wonder if that's just a bunch a blow about the Muslim stuff," "try to put it off on the Muslims," and "it comes right back to Lavelle again; it sounds just like him." The state objected to the introduction of taped segments of the police negotiators' internal discussions. The trial court ruled that the entire version of negotiation tape 6 could be played except for the police negotiators' internal discussions.

{¶ 130} We find that no plain error occurred. Were has failed to establish the relevance of the negotiators' fragmented and speculative comments about Lavelle. Thus, we reject proposition of law XX.

{¶ 131} *Sufficiency and manifest weight of the evidence.* In proposition of law XVII, Were argues that his convictions for the aggravated murder and kidnapping of Vallandingham were based on insufficient evidence and were against the weight of the evidence. Pursuant to R.C. 2953.02, we can overturn a conviction as being against the manifest weight of the evidence in a capital case only when the crime was committed after January 1, 1995. *Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 134. Because the crimes in this case occurred before 1995, we will not address Were's weight-of-the-evidence argu-

ments. Rather, we will consider these arguments in addressing the sufficiency of the evidence.

{¶ 132} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 133} The state presented extensive evidence showing that Were kidnapped Vallandingham. Macko testified that he observed Were and other inmates break down the bathroom door and seize Vallandingham at the start of the riot. Macko and Williams then watched Were and other inmates take Vallandingham in handcuffs from the L–1 bathroom to the L–6 block. There was also ample evidence that Were murdered Vallandingham. During a recorded meeting of inmate leaders on April 15, Were described himself as a "hardliner." He told the other inmate leaders, "We give [the authorities] a certain time * * *. If [the water and power are] not on in a certain time, that's when a body goes out." Snodgrass testified that before the meeting concluded, Were voted to kill a corrections officer if inmate demands were not met. Williams testified that after the meeting, Were said, "I'll do it, I will take care of it. The hardliners is taking over. I'll take care of it."

{¶ 134} Later on April 15, Taylor saw Were and another inmate remove Vallandingham from his cell and walk him to the end of the L–6 block. Sims testified that as he walked past the L–6 shower, he saw Were looking into the shower while two other inmates were strangling Vallandingham inside the shower. Were then ordered Sims and other inmates to carry Vallandingham's body into the recreation yard. Williams testified that several months after the murder, Were told him, "I think they know I killed that guard." Austin also testified that in 2001, Were confided in him that he "kidnapped, robbed and killed Officer Vallandingham." Finally, Piepmeier testified that during the trial of another inmate, Were "indicated that he was present in L–6 when Officer Vallandingham was murdered."

{¶ 135} Were argues that the testimony is unreliable because all the eyewitnesses were inmates who received favorable treatment in exchange for their testimony. He also argues that many of the witnesses lack credibility because they were also guilty of aggravated murder. This contention calls for an evaluation of the witnesses' credibility, which is not proper on review of evidentia-

ry sufficiency. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 200; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶ 136} Were also argues that his "mere presence" in the company of others who killed Vallandingham does not establish his guilt. Were was not an innocent bystander when Vallandingham was killed. He advocated killing a corrections officer and voted to do so. Subsequently, Were orchestrated Vallandingham's murder by removing Vallandingham from his cell, taking him to the shower area, and overseeing the inmates who killed him. Were's argument is without merit.

{¶ 137} Finally, Were argues that the evidence showed the likelihood that Lavelle killed Vallandingham. Were points out that Eskridge and Jefferson testified that Lavelle wanted them to kill Vallandingham. He also emphasizes that Durkin saw Lavelle and four inmates wearing masks and dressed in white food-service uniforms enter the L–6 cellblock before Vallandingham was killed. Nevertheless, Eskridge and Jefferson refused to murder Vallandingham, and there is no evidence that Lavelle and the other inmates entered the L–6 cellblock to kill Vallandingham. Thus, we find that Were's claim that Lavelle was the killer is unsupported by the evidence. Based on the foregoing, proposition of law XVII is rejected.

{¶ 138} *Instructions.* In proposition of law XXII, Were argues that the trial court's instructions on accomplice testimony were deficient. Were contends that the instructions omitted language that more than silence, presence, or acquiescence is necessary to make one an aider or abettor.

{¶ 139} The trial court's instructions on aiding and abetting include the following language:

{¶ 140} "An individual is an accomplice if he aids, if he supports, if he assists, if he encourages, if he cooperates with, if he advises, or if he incites, urges, the principal offender in the commission of the crime; and also, if he shares the criminal intent of the principal.

{¶ 141} "However, mere association with the principal or presence at the scene of the crime, that is not enough.

{¶ 142} "Rather, the State must establish that this defendant took some affirmative action to assist, encourage, or participate in the crime by some act of his, by some word of his, or by some gesture of his.

{¶ 143} "Participation with a criminal intent may be inferred by you from the defendant's action, by the defendant's presence, by the defendant's companionship and conduct, either before or after the commission of the particular offense involved."

{¶ 144} These instructions make it clear that mere association or presence is not enough to make one an aider or abettor. Because these instructions were proper, proposition of law XXII is rejected.

{¶ 145} In proposition of law XXVII, Were argues that the trial court erred by failing to properly instruct the jury on venue. During guilt-phase jury instructions, the trial court stated to the jury:

{¶ 146} "Before we go into the crimes themselves, there are certain things that should be established in the case. One is that whatever happened happened between April 11th and April 21st of 1993, and also that the Southern Ohio Correctional Institution is located in Sciot[o] County, Ohio.

{¶ 147} "For the purposes of this trial, you and I are in Sciot[o] County, Ohio. This case has been transferred from that community to this community because, obviously, they could not handle it. It is a very small county, and also that's where the prison is located and a lot of people work there in the prison who live in Sciot[o] County. So that's why it was legally transferred from Scioto County to here in Hamilton County, but we are to assume that we are in the footsteps of Scioto County."

{¶ 148} Were argues that this flawed instruction relieved the state of its burden of proof as to venue. Were never objected at trial to these instructions and thereby waived all but plain error. *Childs,* 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. Were also did not raise this issue in the court of appeals and waived this claim. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 149} "Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant." *State v. Headley* (1983), 6 Ohio St.3d 475, 477, 6 OBR 526, 453 N.E.2d 716. "The standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." Id., citing *State v. Dickerson* (1907), 77 Ohio St. 34, 82 N.E. 969, syllabus.

{¶ 150} We find no plain error. The evidence established that Were's offenses occurred at the Southern Ohio Correctional Facility at Lucasville, and Hudson testified that the Lucasville prison was located in Scioto County. Thus, venue was proven by the testimony, facts, and circumstances of this case. Accordingly, proposition of law XXVII is rejected.

{¶ 151} *Jury question.* In proposition of law XXI, Were argues that during deliberations, the trial court incorrectly answered a jury question about inferences. During guilt-phase deliberations, the jury wrote the following note to the trial court:

{¶ 152} "Inference was discussed under the 'aggravated murder of Vallandingham during the kidnapping of Vallandingham,' under the section that explains and discusses purpose. (It was only under 'purpose' that inference was discussed.)

{¶ 153} "Can we infer/use inference for all of the charges and apply inference to any charge, or to any definition? And use inference at any time to come to a decision or verdict?"

{¶ 154} After consulting both parties, the trial court provided the jury with the following explanation:

{¶ 155} "You have my instructions in writing, and if you want to look at them, at the beginning of the instructions, I told you that evidence may be of two kinds; direct or circumstantial or a combination of the two.

{¶ 156} "Direct evidence is the testimony of a witness who has actually seen or heard those things that he or she tells you about and includes the exhibits.

{¶ 157} " * * *

{¶ 158} "Circumstantial evidence is the proof of facts by direct evidence and from which you may infer or deduce other reasonable or logical conclusions.

{¶ 159} "So you may reasonably infer, if you care to do so, all of the evidence in this trial * * *. But if you do make that inference, the inference that you end up with must be established beyond a reasonable doubt. But, yes, the answer to your question is, can we infer/use inference for all of the charges and apply inference to any charge and any definition and use inference at any time to come to a decision or verdict?

{¶ 160} "The answer is yes."

{¶ 161} Were claims that these instructions permitted the jury to infer that he had a purpose to kill because the actual killers had such a purpose and thus they attributed to him an intent and purpose harbored by someone else. We conclude that these instructions do not convey that meaning.

{¶ 162} The trial court's answer explained the use of inferences in considering circumstantial evidence. The trial court's further explanation (e.g., "you may reasonably infer, if you care to do so, all the evidence in this trial") referred to the jury's consideration of inferences as to all the charges. The trial court then properly cautioned the jurors that proof beyond a reasonable doubt was necessary if they relied on such inferences. The trial court committed no error in answering the jury's question. Thus, proposition of law XXI is rejected.

### Penalty-Phase Issues

{¶ 163} *Mental retardation.* In propositions of law IV and V, Were argues that the trial court's finding that he is not mentally retarded is unsupported by

the evidence. After the jury found Were guilty of kidnapping and murder, the trial court held a hearing to address defense claims that Were was mentally retarded and, therefore, not subject to a death sentence. See *Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335.

{¶ 164} During the mental-retardation hearing, Were presented the transcript from Were's competency hearings of the previous testimony of inmates Coleman, Grant, and Harris. All three witnesses were in prison with Were at various times and locations. Coleman helped Were with courses he was taking, and they all helped Were with his legal paperwork. All three testified that Were had trouble comprehending and remembering information. Grant and Harris drafted legal motions that Were would then copy in his own handwriting.

{¶ 165} The defense also presented the testimony from the competency proceeding of Jacalyn McCullough, a teacher with the Ohio State Penitentiary. McCullough had taught Were adult basic education courses while he was a prisoner. Were was described as a hard-working student who had trouble comprehending and retaining abstract concepts. McCullough believed that Were would be considered developmentally handicapped in a normal school setting and would test below a 70 IQ. McCullough's testimony indicates that Were had trouble dealing with money and was unable to make change in his head. In McCullough's opinion, Were was capable of working at a "very low functioning" job.

{¶ 166} In addition, the defense presented Were's school records, which showed that he was a very poor student. ·The records show that Were took the Stanford–Binet IQ test when he was seven (in 1964) and 12 years old (in 1969)· and received a score of 69 each time. The school report that accompanied the 1964 IQ results described Were as "functioning in the slow learner range of mental ability."

{¶ 167} Dr. Hammer, a clinical psychologist and mental-retardation expert, testified for the defense. Hammer's evaluation was based on his review of witness testimony and Were's records because Were refused to meet with him. Hammer stated that Were's IQ score of 69 was within the range of mild mental retardation. Hammer testified that based on McCullough's testimony, he thought that Were had subaverage ability in several adaptive behaviors. Hammer pointed to Were's deficiencies in functional academic skills, his employment history of closely supervised menial jobs, and money-management difficulties as shown by Were's inability to make change for a dollar in his head. Hammer concluded that Were was at the "high end of mild mental retardation."

{¶ 168} Dr. Timothy Rheinscheld, a clinical psychologist, testified that Were "meets the diagnostic criteria for mental retardation." Rheinscheld did not personally evaluate Were but reviewed Were's records and McCullough's testimo-

ny. Rheinscheld testified that Were "received an IQ score of 69, which is below the cut off of 70 for mental retardation." Rheinscheld found significant limitations in Were's learning ability resulting from his failure at "different opportunities to try to learn and read." He also found significant limitations in Were's social skills because "on several occasions he assaulted other people while he was in prison." Rheinscheld also noted deficiencies in Were's money-management skills based on his inability "to really add and subtract very well."

{¶ 169} During cross-examination, Hammer and Rheinscheld testified that the cutoff score for mental retardation on the widely used Wechsler IQ test was 70. They also testified that the cutoff score for mental retardation was 68 on the Stanford–Binet IQ test. Both experts acknowledged that claims of cultural bias had been made against the Stanford–Binet test, which Were took as a child. These charges led to the adoption of the adaptive-behavior aspect of the mental-retardation definition.

{¶ 170} Dr. W. Michael Nelson, a clinical psychologist, testified as the state's expert. Were refused to meet with Nelson. Nelson concluded that Were was not mentally retarded after reviewing Were's records and testimony from his competency hearing.

{¶ 171} Nelson testified that Were's score of 69 on the Stanford–Binet tests does not show that he is mentally retarded. Nelson stated that a score of 68 on the Stanford–Binet IQ test equates to a 70 on the Wechsler IQ test. He explained that mental retardation is shown by IQ scores that are two standard deviations below the mean. While the Wechsler and Stanford–Binet tests utilize a mean IQ score of 100, the Wechsler scale uses a standard deviation of 15 and the Stanford–Binet uses a standard deviation of 16. Thus, a person reported as being two standard deviations below the mean would have different scores on the Wechsler and the Stanford–Binet scales.

{¶ 172} Nelson did not find that Were had significant limitations in adaptive functioning. Nelson testified that evaluations of Were's employment skills needed to consider Were's prison jobs as well as any jobs he held prior to going into prison. Nelson stated that Were's employment history before prison showed a "somewhat stable work functioning over three years, the longest being about a year where he was hauling trash." Nelson also testified that Were's membership in the Muslim prison gang provided evidence of his ability to "function within groups * * * that would demonstrate * * * some skill in terms of * * * daily living skills." Further, Nelson testified that notwithstanding the help Were received from other inmates, Were "seems to be able to write, to comprehend the impact of some of these statements, and to use this as a way of trying to influence or explain * * * his present position." Nelson also testified that Were's difficulty

in making change was an insufficient basis for concluding that he had a serious deficiency in family-living skills.

{¶ 173} At the completion of the hearing, the trial court found that Were had not proved by a preponderance of the evidence that he is mentally retarded. In reaching this conclusion, the trial court found that Nelson was "the most reliable of the three psychologists that were appointed." The trial court noted that Were "has been uncooperative throughout this entire proceedings. He's refused to have himself tested [or] examined." The trial court stated that there is no way to determine Were's true IQ score because his IQ test was deemed culturally biased in the 1960s, and the bias would tend to lower the score. In his written findings, the trial court concluded, "The IQ tests taken by defendant at ages seven (1964) and twelve (1969) resulted in a true score of 70, with a five point margin of error."

{¶ 174} The trial court also found that Were did not have significant limitations in two or more adaptive skills. In reaching this conclusion, the trial court noted that Were "rose to leadership positions in prison" and was "articulate in court and wrote and presented numerous motions." The trial court also found that Were's " 'maladaptive behavior' could [have] easily resulted from a sociopathic personality as from an intellectual limitation," and "[s]ince defendant has spent most of his life in prisons his employment history is limited." The trial court concluded that Were has "no significant limitations in communication, daily living skills and socialization."

{¶ 175} In *Atkins,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, the United States Supreme Court held that executing a mentally retarded person violates the Eighth Amendment's proscription against cruel and unusual punishment. *Atkins* did not establish procedures for determining whether an individual is mentally retarded. Rather, the Supreme Court left it to the states to develop " 'appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' " Id. at 317, 122 S.Ct. 2242, 153 L.Ed.2d 335, quoting *Ford v. Wainwright* (1986), 477 U.S. 399, 416–417, 106 S.Ct. 2595, 91 L.Ed.2d 335.

{¶ 176} In *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, we set forth the "substantive standards and procedural guidelines" for determining mental retardation in Ohio. Id. at ¶ 11. *Lott* adopted clinical definitions of mental retardation, cited with approval in *Atkins* for evaluating an individual's claim of mental retardation. Id. at ¶ 12. *Lott* holds that the defendant must raise and prove mental retardation by presenting evidence that he or she (1) suffers from "significantly subaverage intellectual functioning," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18." Id.

{¶ 177} Nelson's testimony and Were's school records support the trial court's findings that Were is not mentally retarded. Nelson testified that Were's score

of 69 on the Stanford–Binet IQ test was not indicative of mental retardation. Moreover, Were's school records, completed at the time of his first IQ test, stated that Were was functioning in the "slow learner" range of mental ability, not that he was mentally retarded. Nelson's testimony showed that Were failed to prove that he suffered significant limitations in two or more adaptive skills. Nelson noted that Were was an active member of the Muslim prison gang, was able to comprehend the impact of his statements, and was involved in writing motions to the court. In contrast, defense experts relied primarily on McCullough's anecdotal testimony about Were's money-management skills and failed to take into account all the evidence about Were's employment history.

{¶ 178} Were argues that the trial court erred by ignoring defense experts. He also asserts that Nelson's opinion was discredited during defense cross-examination. The weight to be given the evidence and the credibility of the expert witnesses are primarily for the trier of the fact. *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332. Thus, the trial court could rely on Nelson's testimony and other evidence in finding that Were failed to meet his burden of proving that he is mentally retarded.

{¶ 179} Were also claims that the trial court's finding that he is not mentally retarded must be reversed because his IQ scores were below 70. *Lott* states that there is a rebuttable presumption that a person is not mentally retarded if his or her IQ is above 70. *Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12. Nothing in *Lott,* however, states that a capital defendant must be found mentally retarded if his IQ score is below 70, regardless of the testing method used to determine that score.

{¶ 180} Were argues that *Lott* makes no distinction between the Wechsler and Stanford–Binet IQ tests in setting 70 as the cutoff level for mental retardation. In *Lott,* we did not direct that a particular test or testing method must be used in determining IQ. On both the Wechsler scale and the Stanford–Binet, the diagnosis for mental retardation is approximately two standard deviations below the mean, which is an IQ of 70 on the Wechsler scale and an IQ of 68 on the Stanford–Binet. See *Bowling v. Commonwealth* (Ky.2005), 163 S.W.3d 361, 374; *State v. Williams* (La.2002), 831 So.2d 835, 853, fn. 26. In this case, expert testimony established that Were's IQ score of 69 on the Stanford–Binet test was above the cutoff level for mental retardation. We find that the trial court did not abuse its discretion in determining that Were's IQ scores on the Stanford–Binet test did not indicate that he was mentally retarded.

{¶ 181} Were also claims that the trial court's findings that his IQ tests were culturally biased and more likely than not resulted in lower scoring is erroneous. This claim lacks merit. During cross-examination, Hammer stated that the Stanford–Binet test that Were took in the 1960s was considered to be culturally

biased. Nelson later explained that the test administered to Were was considered culturally biased because there were "no minorities in the standardization sample. It was an all-white sample." Nelson also testified that cultural bias would have the effect of lowering test scores for minorities.

{¶ 182} Finally, Were argues that the trial court's findings are flawed because the trial court found that Were's IQ tests "resulted in a true score of 70" when he actually scored a 69 on both tests. It is not clear how the trial court arrived at this finding. Even assuming error, the trial court's finding makes no difference because Were's IQ score of 69 did not establish that he was mentally retarded.

{¶ 183} Based on the foregoing, we overrule propositions of law IV and V.

{¶ 184} In propositions of law I, II, and III, Were argues that the jury, and not the judge, should have determined whether he is mentally retarded. *Lott* holds that the decision whether or not a defendant is mentally retarded "should be decided by the court and do[es] not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue)." *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 18. Were invokes *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556; *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403; and *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, in arguing that a jury must determine whether a capital defendant is mentally retarded.

{¶ 185} In *Apprendi*, a noncapital case, the Supreme Court of the United States held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348, 147 L.Ed.2d 435. In *Ring*, a capital case, the Supreme Court of the United States held that a trial judge may not make findings of fact on the aggravating circumstances necessary to impose the death penalty because such a determination is within the province of the jury. *Ring*, 536 U.S. at 609, 122 S.Ct. 2428, 153 L.Ed.2d 556. *Blakely*, a noncapital case, held that the Sixth Amendment prohibits a judge from making a finding on a fact that allowed him to impose a sentence greater than that allowed by a jury verdict or by the defendant's admissions at a plea hearing. *Blakely*, 542 U.S. at 306, 124 S.Ct. 2531, 159 L.Ed.2d 403. In *Booker*, the court applied *Blakely* to make the Federal Sentencing Guidelines advisory, rather than mandatory. *Booker*, 543 U.S. at 243, 125 S.Ct. 738, 160 L.Ed.2d 621.

{¶ 186} Based on the *Apprendi* line of cases, Were claims that the determination of whether a capital defendant is mentally retarded was a factor that

eliminated the possibility of a death sentence, and thus must be decided by the jury. The fact that a capital defendant is not mentally retarded, however, is not an aggravating circumstance that increases a defendant's punishment. Rather, the failure to find mental retardation simply means that the capital defendant remains eligible to be sentenced to death. Such a finding can affect a sentence only by mitigating it. Other jurisdictions that have considered this argument have reached similar conclusions. See *State v. Grell* (2006), 212 Ariz. 516, 526, 135 P.3d 696 ("*Ring* does not require that a jury find the absence of mental retardation"); *State v. Laney* (2006), 367 S.C. 639, 647–649, 627 S.E.2d 726 (same); *Pruitt v. State* (Ind.2005), 834 N.E.2d 90, 112–113 (same); *Howell v. State* (Tenn.2004), 151 S.W.3d 450, 466–467 (mental retardation not required to be proven by the state nor found by a jury); *Head v. Hill* (2003), 277 Ga. 255, 258, 587 S.E.2d 613 (*Ring* and *Atkins* do not require a jury trial on the issue of mental retardation); *Russell v. State* (Miss.2003), 849 So.2d 95, 148 (*Ring* has no application to *Atkins* determination). We conclude that the trial court, not the jury, determines whether a capital defendant is mentally retarded. Nothing in the *Apprendi* line of cases requires otherwise. We overrule propositions of law I, II, and III.

{¶ 187} In proposition of law VI, Were contends that the trial court erred by failing to instruct the jury that the death penalty was not an option if it found that Were was mentally retarded. We conclude that such instructions are not appropriate because the jury does not determine whether a capital defendant is mentally retarded. Thus, proposition of law VI is rejected.

{¶ 188} In proposition of law VIII, Were invokes *Ring* and *Blakely* in arguing that the jury should have been instructed that the state must prove that he was not mentally retarded by proof beyond a reasonable doubt. Were argues that the state has this burden of proof because nonretardation is, and should be, treated as an aggravating factor.

{¶ 189} *Lott* provides that a capital defendant bears the burden of establishing that he is mentally retarded by a preponderance of the evidence. *Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 21. Placing the burden of proof on Were to establish that he is mentally retarded is constitutional. Cf. *Medina v. California* (1992), 505 U.S. 437, 450–451, 112 S.Ct. 2572, 120 L.Ed.2d 353 (state can assign to defendant the burden of proving by a preponderance of the evidence that he is mentally incompetent to stand trial). Moreover, the fact that Were is not mentally retarded does not constitute an aggravating circumstance.

{¶ 190} Several jurisdictions that have considered this issue agree that the defendant has the burden to prove entitlement to the *Atkins* exemption. *Bowling,* 163 S.W.3d at 382; *Williams,* 831 So.2d at 860; *Russell,* 849 So.2d at 148; *Murphy v. State* (Okla.Crim.App.2002), 54 P.3d 556, 568; *Commonwealth v.*

*Mitchell* (2003), 576 Pa. 258, 273, 839 A.2d 202, fn. 8. Thus, we reject proposition of law VIII.

{¶ 191} In proposition of law VII, Were argues that the jury was required to return a life sentence because the defense presented unrebutted expert testimony during mitigation that he is mentally retarded. In mitigation, Were presented evidence of his mental retardation from Drs. Hammer and Rheinscheld, McCullough's videotaped deposition, and Grant. At the mental-retardation hearing, which did not take place in front of the jury, these witnesses echoed their previous testimony. The state called no expert witnesses concerning Were's mental retardation, but cross-examined each of the defense witnesses.

{¶ 192} Defense expert testimony about Were's mental retardation was presented to the jury only as a mitigating factor. The state was not required to rebut such testimony because the trial court had previously determined that Were was not mentally retarded. Thus, this claim lacks merit.

{¶ 193} Were also argues that the death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. He claims that he did not personally kill Vallandingham, that his conviction was based on inmate testimony, and that he demonstrated that he is mentally retarded during the penalty phase. We shall consider this argument during our independent sentence evaluation. Based on the foregoing, proposition of law VII is overruled.

{¶ 194} *Reintroduction of guilt-phase evidence.* In proposition of law XII, Were argues that the trial court erred by introducing irrelevant guilt-phase evidence during the penalty phase. Trial counsel objected to the reintroduction of tunnel tape 32 and the autopsy photographs during the penalty phase. In overruling this objection, the trial court admitted tunnel tape 32 and one upper-body photograph of Vallandingham that showed he had been strangled.

{¶ 195} R.C. 2929.03(D)(1) provides that the prosecutor at the penalty stage of a capital proceeding may introduce "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing." See *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus. We find that the trial court did not err by admitting tunnel tape 32 and the autopsy photograph during the penalty phase because such evidence was relevant in showing prior calculation and design.

{¶ 196} Were also argues that the trial court erred by instructing the jury to "consider all of the testimony in the first trial, which is relevant to this issue." Were did not object to this instruction and thus waived all but plain error. *Childs,* 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 197} To the extent that the jury may have interpreted the instructions as allowing them to determine relevancy, the trial court erred. It is "the trial court's responsibility to determine the admissibility of evidence." *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. Nevertheless, much of the guilt-phase evidence was relevant to the aggravating circumstances. Further, properly admitted evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating factors. We find that the trial court's misstatement did not result in plain error. Accordingly, we overrule proposition of law XII.

{¶ 198} ***Prosecutorial misconduct.*** In proposition of law XI, Were argues that the prosecutor committed misconduct during his penalty-phase closing argument. The test for prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

{¶ 199} Were contends that the prosecutor committed misconduct when he mentioned Were's gang involvement during his argument, stating:

{¶ 200} "But you heard him speak and he wasn't a scared fourth or fifth grader out there in the hallway trying to hide and protect himself and save his life. He was one of the leaders of this entire thing.

{¶ 201} "But for the Muslims, the Black Gangster Disciples, the Aryans, Officer Vallandingham would be alive to this day. They sat and plotted his murder and put it into effect. Nothing in James Were's background, his past, his character, diminished or affected that. The defense psychologist even told you that he knew what he was doing was wrong, that he would have known, that his degree of mental state, his degree of learning, that to participate in the death of a fellow human being was wrong, and he knew it."

{¶ 202} This statement by the prosecutor is a response to defense counsel's comparing Were to a "fourth grader" and suggesting that Were "didn't know what [he was] doing, [and] didn't realize the consequences." The prosecutor's argument pointed out that Were knew what he was doing and that he was one of the gang leaders responsible for Vallandingham's murder. We conclude that the prosecutor's argument represented fair comment and was not improper. See *Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, at ¶ 189 (no misconduct in arguing that defendant "was one of the leaders * * * who controlled and ran the riot" and remarking on his membership in the Aryan Brotherhood).

{¶ 203} Were also argues that the prosecutor committed misconduct by mischaracterizing clinical psychologist Rheinscheld's testimony during his rebuttal argument. The prosecutor stated that Rheinscheld "didn't review the two tapes

that you've had to listen to." Defense counsel objected and stated, "Dr. Rhein-scheld heard the tape." The prosecutor explained that "[h]e heard part of it in the car on the way down here from Columbus yesterday. He was already coming here to testify. His opinion was already set." Defense counsel objected again. The court overruled the objections.

{¶ 204} The prosecutor's rebuttal did not mischaracterize Rheinscheld's testi-mony. During mitigation, Rheinscheld testified that he concluded that Were was mentally retarded after reviewing "a lot of the records," McCullough's testimony, and listening to a couple of tapes. During cross-examination, Rheinscheld acknowledged, "I only reviewed one tape and it was one of those tunnel tapes that they made." He did not recall what Were said on the tape because "[t]here were a lot of voices on there. I was listening to them on my way down here this morning. It was hard for me to discriminate that and negotiate traffic at the same time." Rheinscheld said he had also listened to a "little bit" of the tape before a previous hearing.

{¶ 205} The prosecutor's rebuttal argument represented fair comment. More-over, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668. This claim lacks merit.

{¶ 206} Were argues that the prosecutor committed misconduct by playing one of the tunnel tapes for the jury during his penalty-phase rebuttal. The defense did not object to the prosecutor's action and waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

{¶ 207} During his rebuttal argument, the prosecutor stated, "I am going to play * * * just part of that tape again, because I think it is important that we all hear James Were speak one more time. Something that his two experts never heard. They never heard James Were speak. They want to come and tell you and convince you of certain things, * * * yet * * * when the experts came to see him, to test him, to interview him, * * * he got up and walked out of the room and wouldn't talk to them." The prosecutor then played a portion of tunnel tape 32, which involved discussions of Were and other inmate leaders after Vallanding-ham was killed.

{¶ 208} The tape helped rebut defense arguments that Were was mentally retarded and had only a minor role in Vallandingham's death. Were's discussions on the tape were also relevant because defense experts did not personally evaluate Were before testifying that he was mentally retarded. The prosecutor did not commit plain error in playing the tape.

{¶ 209} Nevertheless, Were contends that by playing the tape, the prosecutor violated *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, by focusing the jury's attention on the nature and circumstances of the offense.

*Wogenstahl* holds that "[it] is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.'" Id. at paragraph two of the syllabus.

{¶ 210} The prosecutor did not characterize any of the facts of the offense as aggravating circumstances. Furthermore, the prosecutor and the trial court correctly identified the statutory aggravating circumstances. Thus, the prosecutor did not violate *Wogenstahl* by playing the tape.

{¶ 211} Finally, Were argues that the cumulative effects of the prosecutor's improper arguments prejudiced him. It is clear from the record, however, that prosecutorial misconduct did not permeate the trial or affect its fundamental fairness. See *State v. Landrum* (1990), 53 Ohio St.3d 107, 113, 559 N.E.2d 710. Based on the foregoing, we reject proposition of law XI.

{¶ 212} *Instructions*. In proposition of law XXX, Were argues that the trial court erred by failing to instruct that a lone juror may prevent a death-penalty recommendation. Trial courts are required to instruct juries that a single juror "may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." *State v. Brooks* (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030.

{¶ 213} The record reveals that the trial court did not provide this instruction to the jury. Were did not object or request a lone-juror instruction at trial and thus waived all but plain error. *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 82. Were also did not raise this issue to the court of appeals and therefore waived this issue. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 214} The instructions were consistent with R.C. 2929.03(D)(2), and the trial court's failure to give a lone-juror instruction is not plain error. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 292, 754 N.E.2d 1150. Accordingly, we reject proposition of law XXX.

### Ineffective Assistance of Counsel

{¶ 215} In proposition of law XXIII, Were argues that his counsel provided ineffective assistance of counsel during both phases of his trial. Were did not raise these claims in the court of appeals and therefore waived them, absent a showing of plain error. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus. To establish ineffective assistance of counsel, Were must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373,

paragraph two of the syllabus. We conclude that defense counsel were not ineffective.

{¶ 216} *Adequacy of cross-examination.* Were argues that his counsel were ineffective by failing to cross-examine several of the state's witnesses in his first trial. Were complains that his counsel's cross-examination of Macko was ineffective because counsel failed to elicit an alleged inconsistency in Macko's testimony from Were's first trial. Were claims that at his first trial, Macko testified that in his initial statement to the OSP, he did not identify Were as an inmate involved in Vallandingham's kidnapping. Were mischaracterizes Macko's testimony. During Were's first trial, Macko identified the inmates involved in the kidnapping and acknowledged that he had previously stated that "Were was in there somewhere too." Thus, trial counsel had no basis for pursuing this proposed line of cross-examination. Further, "[t]rial counsel need not cross-examine every witness * * *. The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment * * *." *State v. Otte* (1996), 74 Ohio St.3d 555, 565, 660 N.E.2d 711.

{¶ 217} Were argues that trial counsel's cross-examination of Williams was ineffective because it did not establish that Williams did not testify that Were had confessed to killing Vallandingham at Were's first trial. During the first trial, Williams testified that Were had stated, "I can't believe that they are taking me back down to Lucasville * * *. * * * [M]an, they must know. Somebody told. I believe they think I killed that guard." During the second trial, Williams testified that Were had stated, "I think they know I killed that guard."

{¶ 218} Williams's testimony at the first trial about Were's statement, which arguably fell short of a confession, established Were's consciousness of guilt and was potentially damaging to the defense case. Counsel's decision to forgo cross-examination of Williams as to his earlier testimony was a tactical decision and did not constitute ineffective assistance. See *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 125.

{¶ 219} Were claims that his counsel were ineffective by failing to cross-examine inmate Sims about his active participation in the riot. Sims indicated that he was not a perpetrator or active participant during the riot. At Were's first trial, inmates Thomas Taylor and Kenneth Law testified that Sims had actively participated in the riot. Whether questioning Sims about Taylor's and Law's testimony would have been productive is speculative. Thus, counsel were not ineffective for failing to cross-examine Sims about Taylor's and Law's testimony. Moreover, Were's counsel effectively impeached Sims by eliciting an admission from Sims that he had withheld information from the prosecutors and that he had once retracted his testimony from three previous trials.

{¶ 220} Finally, Were claims that his counsel failed to develop that inmate Austin's testimony did not match any of the state's theories of his guilt. Austin testified that, while they were in prison together in 2000 or 2001, Were told him that "he was the one who kidnapped, robbed and killed Officer Vallandingham." When Austin asked Were how he did it, Were said that he strangled him.

{¶ 221} Austin's testimony that Were admitted killing Vallandingham conflicted with other evidence showing that Were was an aider and abettor. During closing arguments, trial counsel pointed out that the state's witnesses provided conflicting testimony. Counsel emphasized that "their stories do not coincide. The prosecutor told you that everything has been corroborated * * * but it hasn't." Trial counsel used closing arguments, rather than cross-examination, to point out inconsistencies in the state's evidence. Counsel made a tactical decision and were not ineffective.

{¶ 222} *Failure to call defense witnesses.* Were argues that his counsel were ineffective by failing to call for his second trial several inmates who had testified during his first trial. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749. Moreover, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy* (2001), 91 Ohio St.3d 516, 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶ 223} During Were's first trial, Eddie Moss testified that he saw Lavelle and two masked men enter L–6 on the morning Vallandingham was killed, Tyree Parker testified that he saw Lavelle and two masked men exiting L–6 on the morning of the murder, and Sterling Barnes testified that he saw Lavelle and two masked men enter and exit L–6 that morning. During the second trial, defense witness Gregory Durkin testified that he saw Lavelle and four masked men wearing food service uniforms enter the L–6 block on the morning of Vallandingham's murder. Counsel's decision not to call the witnesses from the first trial was a tactical decision. By not calling Moss, Parker, and Barnes, the defense avoided presenting testimony that conflicted with Durkin's testimony. See *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 215.

{¶ 224} During Were's first trial, Sean Davis and Willie Johnson testified that they heard Lavelle discuss killing a correctional officer before Vallandingham was murdered. Their testimony was similar to that of defense witness Brian Eskridge. At the second trial, Eskridge testified that before Vallandingham's murder, Lavelle said, "We got to kill this C.O. We got to show them that we [are] serious * * *, we have to get this 187" (slang for murder). Counsel may have decided to forgo calling Davis and Johnson during Were's second trial

because their testimony was cumulative. We conclude that counsel made a legitimate tactical decision and were not ineffective.

{¶ 225} During Were's first trial, Anthony Byrd testified that on the morning of April 15, he saw Were escort three other inmates to the cell in which corrections officer Hensley was being held. Byrd heard Hensley crying and begging for his life. Were told Byrd that "two dudes" wanted Hensley to kill another guard. Byrd then saw Vallandingham taken from his cell and moved to a cell with Hensley. Byrd saw a masked inmate give Hensley a cord. He also saw Were standing in front of the cell. Shortly thereafter, two inmates removed Vallandingham's body from his cell. Byrd then saw a "short guy" put a pole on Vallandingham's neck, stand on the pole, and rock back and forth.

{¶ 226} Were fails to explain how Byrd's testimony would have helped the defense in the second trial. Byrd's testimony placed Were at the murder scene when Vallandingham was strangled. Moreover, contrary to Were's claims, Byrd did not identify Lavelle as the person standing on the bar on Vallandingham's neck. Counsel were not ineffective by failing to call Byrd.

{¶ 227} Were mentions three other witnesses who should have been called during his second trial. David Houseman testified during the first trial that he did not see Were in the dayroom during negotiations on April 15. Prentice Jackson testified during the first trial that Vallandingham and other hostages were brought into the L–3 dayroom on the first day of the prison riot, but he did not see Were bring in any of the hostages. Finally, at Were's first trial, defense counsel proffered testimony by Leroy Elmore that Lavelle said Were had "disrespected [him] in front of [his] brothers by hitting [him] for calling the shots." Elmore's testimony was not admitted during the first trial.

{¶ 228} Were fails to explain the relevance of these three witnesses' testimony. In view of their questionable relevance, we conclude that counsel made a legitimate "tactical decision" not to call these witnesses.

{¶ 229} Based on the record of their testimony at the first trial, we conclude that the testimony of these witnesses was not crucial to Were's defense in the second trial. The decision of counsel not to call these witnesses for the second trial was not ineffective assistance.

{¶ 230} *Failure to request a defense expert on tape altering.* Were claims that his counsel were ineffective by failing to request a defense expert to determine whether the tunnel tapes had been doctored. There is no evidence in the record indicating that the tapes were altered. Because no such evidence exists, trial counsel were not ineffective by failing to request an expert to examine the tapes.

{¶ 231} *Failure to make timely objections.* Were also argues that trial counsel were ineffective by failing to object to all objectionable guilt-phase testimony and exhibits. Were has not pointed to any specific evidence that was improperly admitted because of counsel's failure to object. Thus, Were fails to establish that his counsel were ineffective.

{¶ 232} *Failure to call lay witnesses at the mental-retardation hearing.* Were argues that his counsel were ineffective during the mental-retardation hearing. Were claims that trial counsel should have called Grant to testify about Were's mental limitations. The record at the mental-retardation hearing shows that the defense presented a transcript from the competency hearing of the lay testimony of Grant, Coleman, and Harris.

{¶ 233} Were also claims that his counsel were ineffective by failing to call Blackmon to testify that Were was not respected in the Muslim community. During the guilt phase, Blackmon testified that Muslim inmates paid little attention to Were because he was "illiterate." Were contends that Blackmon's testimony shows that the trial court's mental-retardation findings, including the finding that Were "rose to leadership positions in prison," are incorrect. Blackmon's testimony would have made no difference: Were's leadership role during the riot was established by the tunnel tapes and Williams's testimony. Thus, counsel were not ineffective by not calling Blackmon. See *Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 241.

{¶ 234} *Failure to challenge Nelson's expert qualifications.* Were argues that his counsel were ineffective by failing to challenge the expert qualifications of Dr. Nelson, who testified during the mental-retardation hearing. Were does not, however, explain how Nelson's qualifications were deficient.

{¶ 235} Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Moreover, "[t]he individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150. Nelson has a Ph.D. in clinical psychology and is a professor of psychology at Xavier University. He was a past president of the Cincinnati Psychological Association and during the trial was the current president of the American Board of Clinical Psychology. Nelson has also published numerous articles in professional journals and made numerous presentations at conventions and other professional gatherings.

{¶ 236} In attacking Nelson's qualifications, Were asserts that Nelson reached his conclusions by assessing the manner in which Were functioned in prison rather than his peer group in the general population. Were fails, however, to

explain how Nelson's method for reaching his findings disqualified Nelson as an expert witness. Moreover, Nelson assessed Were's functioning in prison because Were had spent much of his life there. Accordingly, we hold that counsel were not ineffective by failing to challenge Nelson's expert qualifications. See *Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 79.

{¶ 237} *Failure to adequately present mitigating evidence.* Were argues that his counsel provided ineffective assistance by failing to call more than one lay mitigation witness and failing to retain various experts to testify during mitigation. "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47.

{¶ 238} Were argues that lay testimony would have established that he relied upon Carlos Sanders, a person of much higher intellect and the leader of the Muslims, to make decisions during the riot. Counsel's decision not to present lay testimony about Were's subservient role was a legitimate tactical decision because other evidence (e.g., the tunnel tapes) showed that Were was a leader during the riot.

{¶ 239} Were also argues that lay testimony should have been presented to show that Were protected some inmates from substantial harm during the riot. During Were's first trial, inmate Mike Trocadero had provided such testimony. Were fails to indicate how such testimony would have affected the outcome of his case.

{¶ 240} Were also claims that lay testimony should have been presented to show that he effectively performed his prison jobs. During Were's first trial, Mary Tanner, a case manager at SOCF, testified that Were did a very good job as a clerk in the prison infirmary. During Were's second trial, Hammer testified that Were's employment record showed that he was always working with someone else. Counsel's decision to forgo further testimony about Were's employment history constituted a tactical decision because such testimony might have undercut other defense arguments that Were was mentally retarded.

{¶ 241} Were contends that his counsel should have retained a prison expert, a cultural expert, and a clinical psychologist. "[T]he presentation of mitigating evidence is a matter of trial strategy." *Keith,* 79 Ohio St.3d at 530, 684 N.E.2d 47. Moreover, " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable * * *.' " *Wiggins v. Smith* (2003), 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471, quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 242} Were argues that his counsel should have called a prison expert who could have explained how overcrowding and lack of other facilities at the prison led to the riot. During the guilt phase, the defense played a tunnel tape during

which inmate leaders discussed their list of grievances at the prison. During penalty-phase opening statements, trial counsel reminded the jurors that they had heard "about the conditions, the circumstances, [and] what it was like at Lucasville * * * prior to and during the course of this riot." Thus, the defense presented "alternative devices that * * * fulfill[ed] the same functions as the expert assistance sought." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus.

{¶ 243} Were argues that his counsel should have called a cultural expert to explain his offenses in terms of prison culture, but he does not explain what such a witness would have said on his behalf. Finally, Were argues that counsel should have retained a clinical psychologist to explain his social history and development. Drs. Hammer and Rheinscheld, however, were hired by the defense and testified during mitigation.

{¶ 244} The record does not show that defense counsel failed to investigate the possibility of presenting additional mitigating testimony. Moreover, we cannot infer a defense failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on Were. See *Murphy*, 91 Ohio St.3d at 542, 747 N.E.2d 765. Based on the foregoing, proposition of law XXIII is rejected.

{¶ 245} In proposition of law XXIV, Were makes several pro se claims that his trial and appellate counsel provided ineffective assistance. We conclude that each of these claims is without merit.

{¶ 246} First, Were alleges that trial counsel paid his appellate counsel to cover up his counsel's and the state's wrongdoing. There is nothing in the record to support these allegations.

{¶ 247} Second, Were argues that his counsel failed to challenge his indictment. During pretrial proceedings, Were addressed the court and alleged that his indictment was defective because he was being retried with a case number that differed from the case number on his indictment. Defense counsel sent Were a letter dated December 17, 2002, that provided an explanation for the renumbering of the indictment.

{¶ 248} Third, Were claims that his counsel refused to challenge the court's ruling that he wear a stun belt. Trial counsel did not raise this issue at trial. As discussed in proposition of law XXVI, the record contains no indication that the jury could see or knew that Were was wearing a stun belt. No plain error occurred.

{¶ 249} Fourth, Were claims that his counsel refused to raise the issue that he was sent to Oakwood Correctional Facility for a competency evaluation but was not examined there. He also states that when he was sent back to the Lebanon

Correctional Institute, he was placed on suicide watch and left in an unclean room because he would not talk to the doctors. During the competency hearing, trial counsel raised Were's treatment at Oakwood and Lebanon to explain his reasons for refusing to be evaluated by other psychologists. Were fails to explain any additional issues regarding these events that his counsel should have raised.

{¶ 250} Fifth, Were argues that his counsel were ineffective by failing to call Mackey, his former attorney, and McCullough at the competency hearing. The record shows that at the competency hearing, his counsel presented McCullough's testimony as well as statements made by Mackey to the court prior to Were's first trial. Were also argues that his counsel were deficient by failing to call his brother Stanley Nesbitt, his brother-in-law Robert Arrington, and Dorian Hall at the competency hearing. Were fails to explain the substance of their testimony.

{¶ 251} Finally, Were claims that his counsel should have recalled Marva Allen, a state witness, to show that she had been untruthful when she testified and to question her about the log of Were's activities while at Lebanon Correctional Institute. He also states that Alice Lynd should have been called to establish that fact. Even assuming that Allen did not testify truthfully, Were has not established that her testimony was prejudicial.

{¶ 252} Based on the foregoing, proposition of law XXIV is rejected.

### Sentencing Opinion

{¶ 253} In proposition of law XIV, Were argues that the trial court's sentencing opinion is defective. Were contends that the sentencing opinion fails to explain why the trial court found that the aggravating circumstances outweigh the mitigating factors. But the sentencing opinion did discuss the aggravating circumstances and the mitigating factors presented during the penalty phase:

{¶ 254} "The Court, after receiving the trial jury's recommendation that the sentence of death be imposed, finds, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing outweigh any mitigating factor or factors which may be present. Even though defendant was not the principal offender and has some limited intellectual abilities, these factors are outweighed by the aggravating circumstances of the kidnapping and murder of a prison guard. The sentence of death is appropriate."

{¶ 255} The trial court explained why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors, as required by R.C. 2929.03(F). No further analysis was required. See *Filiaggi*, 86 Ohio St.3d at 245, 714 N.E.2d 867. We conclude that this claim lacks merit.

{¶ 256} Second, Were argues that the opinion improperly treated the nature and circumstances of the offense as nonstatutory aggravating circumstances.

The trial court accurately identified the two aggravating circumstances. When a court does so correctly, that court is presumed to rely only on those circumstances and not on nonstatutory aggravating circumstances. *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271. The trial court must also examine the nature and circumstances of the offense to determine whether they are mitigating. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 157. Thus, we overrule proposition of law XIV.

### Independent Review by the Court of Appeals

{¶ 257} Following a remand from this court, the court of appeals conducted its independent review of the death sentence as required by R.C. 2929.05(A). See *State v. Were*, Hamilton App. No. C–030485, 2006-Ohio-3511, 2006 WL 1867840, at ¶ 22–34. In proposition of law XV, Were argues that the court's independent review of his death sentence was deficient because the court's conclusion that he is not mentally retarded is unsupported by the evidence. The court, however, fully discussed mitigation evidence that Were was mentally retarded. The court then concluded that although "Were's limited intellectual abilities are entitled to some weight in mitigation, the evidence produced in the trial did not establish that Were was mentally retarded." Id. at ¶ 26.

{¶ 258} Were makes the same arguments that he made in propositions IV and V in challenging the conclusion that he is not mentally retarded. The conclusion reached by the court of appeals in its independent review, however, is supported by evidence presented during the mental-retardation hearing. Moreover, our independent sentence assessment will cure any deficiency in the court of appeals' opinion. *State v. Hill* (1996), 75 Ohio St.3d 195, 211, 661 N.E.2d 1068; *State v. Simko* (1994), 71 Ohio St.3d 483, 493, 644 N.E.2d 345. Based on the foregoing, we reject proposition of law XV.

### Settled Issues

{¶ 259} *Proportionality.* In proposition of law XIII, Were disputes the constitutionality of Ohio's death-penalty proportionality review. We summarily reject these arguments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 260} *Constitutionality.* In proposition of law XVI, Were attacks the constitutionality of Ohio's death-penalty statutes. We have previously rejected similar claims. *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph one of the syllabus.

## Cumulative Errors

{¶ 261} In proposition of law XXXIII, Were argues that cumulative errors deprived him of a fair trial and require reversal of his convictions and death sentence. We conclude that Were received a fair trial. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *Hill,* 75 Ohio St.3d at 212, 661 N.E.2d 1068. Thus, we reject proposition of law XXXIII.

## INDEPENDENT SENTENCE EVALUATION

{¶ 262} We are required by R.C. 2929.05(A) to independently review Were's death sentence for appropriateness and proportionality. The evidence at trial established beyond a reasonable doubt that Were murdered corrections officer Robert Vallandingham purposely and with prior calculation and design while Were was a prisoner in a detention facility, R.C. 2929.04(A)(4), and purposely and with prior calculation and design while committing or attempting to commit kidnapping, R.C. 2929.04(A)(7). Against these aggravating circumstances, we must weigh the mitigating factors contained in R.C. 2929.04(B). Were called four mitigation witnesses. Were did not present a sworn or unsworn statement.

{¶ 263} Jacalyn McCullough's videotaped testimony, which was presented during Were's competency and mental retardation hearings, was played for the jury. McCullough, a prison teacher, taught Were adult basic education courses for over a year while he was in prison. She testified that Were's reading level was at the fourth- or fifth-grade level, and his math skills were at the third-grade level. Were also did poorly in social studies and did not understand any kind of science terminology. McCullough believed that Were would be considered developmentally handicapped in a normal school setting. Despite his intellectual limitations, Were wanted to learn and worked very hard in school.

{¶ 264} Dr. David Hammer testified that in his opinion, Were is mildly mentally retarded. Hammer testified that Were scored a 69 on the Stanford–Binet IQ test in 1964 and 1969. He testified that Were's employment history, his academic deficits, and his poor money-management skills provided evidence of limitations in his adaptive behavior.

{¶ 265} Dr. Timothy Rheinscheld testified that in his opinion, Were is mentally retarded. Rheinscheld's opinion was based on Were's two IQ scores of 69, and his finding of significant defects in Were's adaptive behavior, as shown by Were's school and prison records and McCullough's testimony.

{¶ 266} Danny Grant's testimony was presented to bolster the defense claim that Were is mentally retarded. Were and Grant were fellow inmates at the Lebanon Correctional Institute from 1999 to 2002. Grant assisted Were with his legal paperwork because "his comprehension level wasn't up to par of understanding what was going on." He helped Were spell, pronounce words, and

comprehend the meaning of legal documents. Grant had to repeat his explanations because Were had trouble remembering what he was told. On one occasion, Grant drafted a motion for Were that Were copied in his own handwriting.

### Sentence Evaluation

{¶ 267} We find nothing in the nature and circumstances of the offense to be mitigating. Were was one of the leaders during the Lucasville prison riot. He helped remove Officer Vallandingham from the bathroom where he was hiding and took him to the L–6 cellblock where he was locked up. On April 15, 1993, Were advocated that a prison guard be killed to demonstrate that the inmates' demands should be taken seriously. Were then supervised the group of inmates who strangled Vallandingham in the L–6 shower. These facts establish a horrific crime without any mitigating factors.

{¶ 268} Although Were's character offers nothing in mitigation, we give some weight to his history and background. Were did poorly in school and never finished high school. Nevertheless, McCullough testified that Were wanted to learn and tried to do well in taking adult basic education courses in prison.

{¶ 269} The statutory mitigating factors are generally inapplicable here, including R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(4) (youth of the offender), and (B)(5) (lack of a significant criminal record). Were's mental deficiencies do not qualify as an R.C. 2929.04(B)(3) factor because there was no testimony that Were, by reason of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Nevertheless, Were's limited intellectual abilities are entitled to some weight in mitigation under the catchall provision of R.C. 2929.04(B)(7). See *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 267. Dr. Hammer and Dr. Rheinscheld testified that Were has a low IQ and significant defects in his adaptive behavior. Evidence of Were's leadership and decision-making during the riot, however, undercut his claim of limited intellectual functioning. Moreover, the evidence did not establish that Were is mentally retarded. Thus, Were's execution is not barred by *Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. The mitigating factor under R.C. 2929.04(B)(6) is directly applicable because Were acted as an accomplice and not as the principal offender. Although Were was not the actual killer of Vallandingham, he was one of the leaders who decided upon, planned, and supervised the murder. Thus, this mitigating factor is entitled to very little weight. The evidence does not suggest any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 270} We find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Were murdered Vallandingham while he was

a hostage during the Lucasville prison riot. Compared with these serious aggravating circumstances, Were's mitigating evidence has little significance.

{¶ 271} Finally, we hold that the death penalty is both appropriate and proportionate to death sentences approved in other Lucasville cases. See *Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 246; *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 198; *State v. Sanders* (2001), 92 Ohio St.3d 245, 281, 750 N.E.2d 90; and *Robb*, 88 Ohio St.3d at 91, 723 N.E.2d 1019. It is also proportionate to death sentences approved for other aggravated murders in a detention facility. See *State v. Stojetz* (1999), 84 Ohio St.3d 452, 472, 705 N.E.2d 329; *State v. Zuern* (1987), 32 Ohio St.3d 56, 66, 512 N.E.2d 585. Further, it is proportionate to death sentences approved for other aggravated murders during kidnappings. See *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 334; *State v. Davie* (1997), 80 Ohio St.3d 311, 334, 686 N.E.2d 245.

Judgment affirmed.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Mark E. Piepmeier, Special Prosecuting Attorney, and William E. Breyer, Assistant Special Prosecuting Attorney, for appellee.

H. Fred Hoefle and Chris McEvilley, for appellant.