[Cite as *State v. Bush*, 2021-Ohio-4269.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. W. Scott Gwin, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 2021 CA 0019 |
| CORY J. BUSH | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:       Criminal Appeal from the Court of Common Pleas, Case No. 2020 CR 0680


JUDGMENT:       Reversed and Remanded


DATE OF JUDGMENT ENTRY:       December 3, 2021


APPEARANCES:

For Plaintiff-Appellee        For Defendant-Appellant

WILLIAM C. HAYES        WILLIAM T. CRAMER
PROSECUTING ATTORNEY        470 Olde Worthington Road
PAULA M. SAWYERS        Suite 200
ASSISTANT PROSECUTOR        Westerville, Ohio 43082
20 South Second Street, Fourth Floor
Newark, Ohio 43055

*Wise, J.*

**{¶1}** Defendant-Appellant Cory J. Bush appeals his convictions and sentences entered in the Licking County Court of Common Pleas following a trial by jury.

**{¶2}** Appellee is the state of Ohio.

### STATEMENT OF THE FACTS AND CASE

**{¶3}** On December 30, 2020, Defendant-Appellant Cory Bush was indicted for failure to stop after an accident, in violation of R.C. §4549.02(A)(1), as a second-degree felony; aggravated vehicular homicide, in violation of R.C. §2903.06(A)(2)(a), as a third-degree felony; vehicular assault, in violation of R.C. §2903.08(A)(2)(b), as a fourth-degree felony; and falsification, in violation of R.C. §2921.13(A)(3), as a first-degree misdemeanor. These charges arose from events that occurred on December 23, 2020.

**{¶4}** The matter proceeded to a jury trial where the following testimony was presented.

**{¶5}** Nandini Agarwal testified that during the afternoon of December 23, 2020, she took her granddaughter for a walk up Londondale Road and turned around at the bottom of the hill. She had to take a break because of asthma and stopped along the side of the road next to the grass. She briefly saw a car before it hit her. Agarwal was still using a wheelchair at the time of trial. Her right hand and right leg were damaged in the accident. She had several surgeries. (T. at 265-267).

**{¶6}** Molly Persons, a registered medical assistant, testified that around 2:55 p.m. on December 23, 2020, she was walking her dog along Frasure Street. Persons heard a thumping noise from Londondale Road up a hill from her and saw something fly into the air. Persons began heading up the hill and saw a car driving down the hill slowly,

with a man inside looking around. As the car went past her, it sped up and drove away. Persons saw the person driving the vehicle and saw the car's windshield wipers pointing up at odd angles. (T. at 129-136). Persons identified Appellant Bush as the driver during trial. (T. at 141-142).

{¶7} Persons ran up the hill and saw a woman in the road and a stroller upside down on the curb with a child inside. The woman was laying on her stomach in the road and not moving. She had blood coming from her nose and mouth, but she was alert and talking. Persons checked the child for movement and found none. Persons unstrapped the child, laid her on her back, and found no breath sounds or heartbeat. (T. at 137-138). Persons began CPR on the child. *Id.* During CPR, Persons stopped because the child started to choke and her eyes started fluttering. Persons still could not find a heartbeat and continued CPR. At that point, blood began coming out from the child's nose and mouth, which she stated is a sign of internal bleeding. After about five minutes, EMS arrived and took over care. By then the child had a heartbeat, and Persons had her wrapped in a blanket. (T. at 136-141).

{¶8} FedEx driver Jessica Reames testified that she came across the injured woman in the road and the upside-down stroller and called 911 at 2:55 p.m. The driver also saw Persons come running up the hill. (T. at 139-140, 153-155). The driver said the child was not breathing and was turning blue until Persons began CPR, then she took a breath and blood started coming out of her nose and mouth. (T. at 158). The FedEx driver did not see any other children playing nearby. (T. at 156-157).

{¶9} Justin Mooney, one of the firefighter-paramedics called to the scene, testified that when he arrived on the scene the child was unconscious but breathing. They

inserted an IV and intubated her. The child remained in critical condition while they were involved. (T. at 187-189). Mooney testified that, absent intervention, the child would not have survived. (T. at 189).

{¶10} Michelle McCann testified that she lived next door to Appellant in an apartment complex and knew that Appellant had two young children and drove a green car. McCann encountered the accident scene when she left her apartment that day. When she heard there was a child involved, she broke down and returned to her apartment. (T. at 162-166). Later that evening the police came by and showed McCann photos of a green car. She could not initially identify the car, but from additional photos she was able to recognize it as Appellant's car.

{¶11} The police talked with other neighbors and knocked on Appellant's door, but got no response. There were no lights on in Appellant's apartment or sounds coming from inside. (T. at 167-169).

{¶12} After most of the police left, McCann continued talking to neighbors about Appellant, and one of the neighbors was complaining about Appellant and his children. At that point, Appellant came out of his apartment to yell at them. McCann then went to a detective's car, knocked on the window, and notified them that Appellant came out of his apartment. (T. at 169-171).

{¶13} McCann also showed the police photographs of Appellant's car leaving the apartment complex that were captured on her security camera. Still photographs provided at trial showed Appellant's car at the apartment at 2:48 p.m. and gone at 2:57 p.m. (T. at 173-174).

**{¶14}** Deputy Thomas testified that they found tire marks coming off the curb onto the roadway at the accident scene which were indicative of a driver not in control of the vehicle. (T. at 208-209). However, the deputy admitted that the grass where the tire marks originated was not dug up. The deputy also admitted that tire marks like that would require the application of a great amount of force, either acceleration or braking, and would produce a screeching noise. Additionally, the marks were faded, making it possible that they were previously there. (T. at 216-217, 223-224).

**{¶15}** Officer Dickman testified that he saw furrows in the grass along with the skid marks, indicating that the vehicle went off to the right side of the road and then came back left. (T. at 227-228). Again, the officer admitted that the skid marks on the pavement could have been there previously. (T. at 232-233).

**{¶16}** Officer Trotter testified that the tire marks were "critical speed scuff marks" caused by acceleration as the wheels bounced coming off an uneven surface. Trotter testified that he saw no evidence of braking. (T. at 236-237). Trotter denied that the tire marks looked faded, claiming that they looked fresh. Nonetheless, Trotter admitted that the tire marks could have been there before. Trotter testified that you can tell a fresh tire mark because you can rub it off the pavement with your hand, although in this case he never reached down to try to rub the pavement because he believed these marks were probably fresh. (T. at 241-244).

**{¶17}** Officer Gossett participated in attempting to locate the vehicle that was involved in the accident. He was told it was a four-door black or dark-colored sedan. He went to a neighboring school and a church to review camera footage, and also drove the neighborhood looking for Ring doorbells that may have cameras. The church had footage

of a four-door grayish-green vehicle passing-by around the time of the dispatch call. (T. at 247-250).

**{¶18}** Officer Stevens obtained the video from the church. Stevens testified that the video showed the victim walking with a stroller westbound on Londondale Parkway. When the victim goes behind some large bushes, a loud collision is audible. After the collision, the video showed a light green car drive by without stopping or slowing and moving out of frame as it turns left on Frasure Street. Another camera angle shows the green car exiting the nearby apartments on Londondale, turning eastbound on Londondale, and passing out of frame. (T. at 273-278). Other officers learned the make and model of the vehicle from camera footage from a nearby school. (T. at 279).

**{¶19}** Officer Stevens and some other officers went to the apartment complex and began knocking on doors in an effort to identify the vehicle. One of the residents recognized Appellant's vehicle and pointed out Appellant's apartment, but did not know Appellant's full name. The officer checked the mailbox for the apartment and found a flyer addressed to Cory Bush. Dispatch then reported that a green Toyota Avalon was registered to Bush. (T. at 280-283). Officer Stevens knocked at the apartment multiple times without a response. The apartment was dark and silent. The officers remained in front of the apartment for a while talking to neighbors. They eventually decided to check some other addresses they had for Bush, but before Stevens could leave, a neighbor stopped him to say that Appellant was outside his apartment arguing with the neighbors. (T. at 285-287).

**{¶20}** When the officers questioned Appellant, he said he dropped his car off for servicing at 9:00 a.m. One of the neighbors then told the officers that Appellant was lying.

The neighbor showed the officers her Ring doorbell video showing Appellant's car in front of the apartments at 2:48 p.m. and gone at 2:57 p.m. The detective also contacted the service shop, and they denied receiving Appellant's car that day. (T. at 287-290).

**{¶21}** Based on a review of the available videos, Officer Stevens admitted that Appellant's car was not going very fast. In fact, the other cars in the video, including the FedEx truck, were going faster than Appellant. The officer believed that Appellant was going slower than the other cars in the video because he had just come from a stop and was turning onto the road. (T. at 301-302).

**{¶22}** Detective Angles testified that the compiled security footage showed Appellant's vehicle pulling out of the apartment complex, turning left onto Londondale, and then going out of view. Another camera showed the victims walking on Londondale and then they also go out of view. While everyone is out of view for a few seconds you can hear a thud sound. A few seconds later Appellant's vehicle comes back into view, turns off Londondale, and drives away. (T. at 307).

**{¶23}** Det. Angles helped look for the car at the apartment complex and knocked on Appellant's door looking for him. Det. Angles was also there with Officer Stevens when a neighbor told them that Appellant had come out of his apartment. Det. Angles recorded their conversation with Appellant. During the conversation, Appellant denied any involvement.

**{¶24}** The police had Appellant down to the police station rather than arrest him on the scene. (T. at 309-315). At the station, the police read Appellant his Miranda rights and interviewed him. During the interview, Appellant initially denied being involved and said he knew the child victim was on her deathbed. (T. at 316-317). Appellant eventually

admitted to hitting the victims, but claimed they had been standing in the middle of the road. (T. at 328).

**{¶25}** Detective Farmer testified that Bush did not show any emotion until they told him they were going to arrest him. (T. at 340).

**{¶26}** Det. Angles searched Bush's phone and found a text that came in at 2:56 p.m., which was around the time of the accident. (T. at 318-319). The text was an unsolicited spam message about how to make money every month. (T. at 327).

**{¶27}** Det. Farmer admitted that they could not tell whether Bush looked at the text message. (T. at 342).

**{¶28}** Det. Angles confirmed that Bush was not sending or receiving Facebook messages and was not on the phone at the time of the accident. (T. at 329).

**{¶29}** Appellant voluntarily provided blood for a drug and alcohol check at around midnight, which was far outside the three-hour limit for admissible results. Given the several-hour delay, the detective did not expect to find any alcohol in Appellant's system, and there was no way to check for drugs. Ultimately, there was no alcohol found in Appellant's blood, although Appellant did admit to smoking marijuana earlier. (T. at 320-322, 329-331).

**{¶30}** Appellant's vehicle had damage to the driver's side of the hood, a cracked windshield, and a missing windshield wiper. The detective opined that the windshield was cracked by the wiper going through it, and the wiper was found in the backseat of the car. (T. at 323-324).

**{¶31}** Appellant testified in his own defense. Appellant told the jury that he has sole custody of his two children, who were six and eight years old at the time. (T. at 354-

355). On the day of the accident he was home with the children, who were playing outside because it was a nice day. The children came in and wanted food. Appellant explained that he was going to make them chicken nuggets, but there were none in the freezer so he decided to go to McDonald's for them. The children were playing outside with friends when he left. (T. at 355-356). Appellant drove out of the apartment complex up a small incline and turned left onto the road. As he made the turn, he watched the grassy area by the apartment complex because some of the children were out playing, and he was afraid they would run in to the street. He stated that he was driving approximately ten to fifteen miles per hour as he crested the hill and looked back to the front. He stated that was when he struck the victims. He testified that they must have been in the middle of the road by the way they came up over the hood of the car. He testified that the victims seemed to come out of nowhere, and he did not have time to brake. (T. at 356-359). He denied driving off the roadway. (T. at 368-369). He testified that he panicked when he realized he had hit someone, and that he drove until he could find a parking spot and then had to get out of the car because he was shaking so much. Appellant testified that he kept driving after hitting Nandini Agarwal and Amara White, and that he did nothing to attempt to help them. (T. at 369).

{¶32} He stated that he then ran home to get back to his children. He claimed that he did not know what to do. He said that he initially lied to the police because he was afraid of being arrested and having Children's Services take his children. (T. at 359-360). Appellant explained that he did not show much emotion when he first spoke with the police because he did not know that the child had died. (T. at 361). Appellant said that he

did not learn the child died until he was already in jail and received the paperwork with charges. (T. at 376).

**{¶33}** Appellant admitted having a 2020 conviction for aggravated possession of methamphetamine. (T. at 370). Appellant also stated that he last smoked a joint three to four weeks before the accident. (T. at 375).

**{¶34}** The defense also called Appellant's mother as a character witness. On cross-examination, Appellant's mother admitted that she knew that Appellant also had a 2004 burglary conviction. (T. at 381).

**{¶35}** The prosecution called Det. Farmer on rebuttal. Det. Farmer testified that if Appellant was travelling at 15 miles per hour, it would have taken 11.13 seconds to travel the 245 feet from the apartment entrance to the area of impact. The detective clarified that the area of impact that he measured was the location where all the debris from the impact came to rest. (T. at 385-386).

**{¶36}** Before the jury, Appellant stipulated that Nandini Agarwal sustained serious injuries that were the result of the incident; that Amara White sustained serious injuries from the incident; that she died from those injuries two days later; and further stipulated to the medical records submitted by the State of Ohio. (T. at 351-353).

**{¶37}** After the close of evidence, the jury found Appellant guilty on all four counts. (T. at 452-454). The court moved immediately to sentencing and imposed five (5) to seven and one-half (7½) years for the failure to stop, five (5) years for aggravated vehicular homicide, one and one-half (1½) years for vehicular assault, and six (6) months for falsification. The court imposed all counts consecutively, except the misdemeanor falsification, for an aggregate prison term of eleven and one-half years (11½) to fourteen

(14) years. The court also imposed a mandatory three (3) year term of post-release control. Finally, the court declined to impose fines, but imposed costs. (T. at 455-470).

{¶38} Appellant now appeals, raising the following assignments of error:

**ASSIGNMENTS OF ERROR**

{¶39} "I. THE SECOND-DEGREE FELONY SENTENCE IMPOSED FOR FAILURE TO STOP AFTER AN ACCIDENT WAS UNLAWFUL.

{¶40} "II. APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED BY ERRONEOUS JURY INSTRUCTIONS ON THE SPECIAL FINDINGS NECESSARY TO ELEVATE THE OFFENSE OF FAILURE TO STOP TO A FELONY

{¶41} "III. APPELLANT'S DUE PROCESS RIGHTS WERE VIOLATED BY INSUFFICIENT EVIDENCE ON THE SPECIAL FINDING NECESSARY TO ELEVATE FAILURE TO STOP TO A SECOND-DEGREE FELONY.

{¶42} "IV. THE WEIGHT OF THE EVIDENCE DID NOT SUPPORT A TRUE FINDING ON THE SPECIAL FINDING NECESSARY TO ELEVATE FAILURE TO STOP TO A SECOND-DEGREE FELONY."

**I. , II., III. and IV.**

{¶43} In his four Assignments of Error, Appellant argues the jury instructions and verdict form submitted to the jury on the failure to stop charge were insufficient to support a second-degree felony finding and therefore resulted in an unlawful sentence. We agree.

**STANDARD OF REVIEW**

**{¶44}** Initially, we find that despite requesting the proper instruction orally during trial, Appellant did not object to the jury instructions or the verdict forms that were presented to the jury. A review of the transcript reveals that defense counsel informed the trial court that the jury instructions and verdict forms were correct and did not need any changes or corrections. (T. at 350, 446-448). Furthermore, Appellant did not poll the jury as to their verdicts or their special findings. (T. at 454).

**{¶45}** The failure to object to instructions typically results in waiver of the error and results in a plain error analysis on appeal. *See State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 60. The Supreme Court of Ohio has described plain-error analysis as follows:

> Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings," However, even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same *deferential* standard for reviewing ineffective assistance of counsel claims.

**{¶46}** (Emphasis sic; citations omitted.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *see also, e.g.*, *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, 950 N.E.2d 931, ¶ 13; *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

**{¶47}** Appellant was charged with failing to stop after an accident pursuant to R.C. §4549.02, which provides in relevant part:

(A)(1) In the case of a motor vehicle accident or collision with persons or property on a public road or highway, the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision. The operator shall remain at the scene of the accident or collision until the operator has given the operator's name and address and, if the operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to all of the following:

(a) Any person injured in the accident or collision;

(b) The operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision;

(c) The police officer at the scene of the accident or collision.

(2) In the event an injured person is unable to comprehend and record the information required to be given under division (A)(1) of this section, the other operator involved in the accident or collision shall notify the nearest police authority concerning the location of the accident or

collision, and the operator's name, address, and the registered number of the motor vehicle the operator was operating. The operator shall remain at the scene of the accident or collision until a police officer arrives, unless removed from the scene by an emergency vehicle operated by a political subdivision or an ambulance.

(3) ***

(B)(1) Whoever violates division (A) of this section is guilty of failure to stop after an accident. Except as otherwise provided in division (B)(2) or (3) of this section, failure to stop after an accident is a misdemeanor of the first degree.

(2) If the accident or collision results in serious physical harm to a person, failure to stop after an accident is whichever of the following is applicable:

(a) Except as otherwise provided in division (B)(2)(b) of this section, a felony of the fifth degree;

(b) If the offender knew that the accident or collision resulted in serious physical harm to a person, a felony of the fourth degree.

(3) If the accident or collision results in the death of a person, failure to stop after an accident is whichever of the following is applicable:

(a) Except as provided in division (B)(3)(b) of this section, a felony of the third degree;

(b) If the offender knew that the accident or collision resulted in the death of a person, a felony of the second degree.

**{¶48}** Appellant herein asserts that the special findings contained in the jury verdict forms were insufficient to elevate the failure to stop charge beyond a fourth-degree felony.

**{¶49}** R.C. §2945.75 sets forth the requirements of a verdict form:

(A) When the presence of one or more additional elements makes an offense one of more serious degree:

* * *

(2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

**{¶50}** R.C. §2945.75 requires that both the charging instruments, such as a complaint or indictment, and the jury verdict form to either state the degree of the offense or state the additional element(s) warranting a higher degree of the offense.

**{¶51}** The Ohio Supreme Court has addressed what this statute means in *State v. Pelfrey,* 112 Ohio St.3d 422, 2007–Ohio–256, 860 N.E.2d 735. In *Pelfrey*, the Supreme Court of Ohio applied R.C. §2945.75 to the offense of tampering with records. The offense of tampering with records is a first-degree misdemeanor offense but elevated to a third-degree felony if the records involved are government records. A jury found defendant Pelfrey guilty of the offense, and he was convicted of the offense as a third-degree felony. The verdict form signed by the jury, however, did not state either the degree of the offense or a finding that the records involved were government records.

{¶52} Although the verdict form mentioned the indictment, which referenced the government records, and the jury instructions addressed the government records issue, the court applied R.C. 2945.75(A)(2) and reduced Pelfrey's offense of tampering with evidence to a first-degree misdemeanor. The court emphasized that "[b]ecause the language of R.C. 2945.75(A)(2) is clear, this court will not excuse the failure to comply with the statute or uphold [a] conviction based on 'additional circumstances.' " *Id.* at ¶ 14. Specifically, the failure in complying with the statute cannot be excused by showing that "the verdict incorporates the language of the indictment, or by presenting evidence to show the presence of the aggravated element at trial or the incorporation of the indictment into the verdict form, or by showing that the defendant failed to raise the issue of the inadequacy of the verdict form." *Id.* The court held that "pursuant to the clear language of R.C. 2945.75, a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense." *Id.*

{¶53} Six years later, in *McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, 1 N.E.3d 374, the Supreme Court of Ohio reaffirmed its holding in *Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735, stating that "*Pelfrey* makes clear that in cases involving offenses for which the addition of an element or elements can elevate the offense to a more serious degree, the verdict form itself is the only relevant thing to consider in determining whether the dictates of R.C. 2945.75 have been followed." *McDonald* at ¶ 17.

{¶54} *McDonald* involved the offense of failure to comply with an order or signal of a police officer in violation of R.C. §2921.331. Under the statute, the lowest degree of

the offense is first-degree misdemeanor. The offense is a felony only if the offender willfully eludes or flees a police officer: if he was fleeing immediately after committing a felony, the offense is a fourth-degree felony; if his operation of the vehicle caused a substantial risk of serious physical harm, the offense is a third-degree felony. Defendant McDonald was indicted for a third-degree felony count of the offense for willfully eluding or fleeing a police officer and causing a substantial risk of serious physical harm by his operation of the vehicle. The jury verdict form did not indicate the degree of the offense, and it only mentioned his offense of failure to comply with an order or signal of a police officer and his operation caused a substantial risk of serious harm. It did not mention the element of "willfully eluding or fleeing a police officer."

**{¶55}** The Supreme Court of Ohio reasoned that the verdict form did not properly indicate the element of willful elusion and, without it, McDonald can only be convicted of a first-degree misdemeanor. In reaching this conclusion, the court emphasized that we look only to the verdict form signed by the jury and not "additional circumstances" such as the incorporation of the indictment into the verdict form, the evidence presented at trial, or the fact that the defendant failed to raise the inadequacy of the verdict form below, when determining whether the defendant was properly convicted of an elevated offense. *McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, 1 N.E.3d 374, at ¶ 17-18, citing Pelfrey, 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735, at ¶ 14.

**{¶56}** In the instant case, pursuant to the statute as set forth above, to raise the degree of offense for failure to stop after an accident from a fourth-degree to a third-degree felony or a second-degree felony, the state must prove certain additional elements. In this case, the State was required to prove that the accident or collision

resulted in the death of a person to elevate the offense to a third-degree felony and/or that Appellant knew that the accident or collision resulted in the death of a person to elevate the offense to a second-degree felony. The fourth-degree felony only requires the State to prove that Appellant knew that the accident or collision resulted in serious physical harm to a person

**{¶57}** Thus, the degree of offense changes upward from a fourth-degree felony to either a third degree or a second-degree offense if the State can prove the additional factors of the accident resulting in death to a person and/or knowledge of death to person.

**{¶58}** Here, the Criminal Verdict Form and the Special Findings submitted with the verdict form submitted to the jury on Count 1 read:

### **CRIMINAL VERDICT FORM**

We, the Jury, do find beyond a reasonable doubt the Defendant, Cory J. Bush, GUILTY of failure to stop after an accident in violation of Section 4549.02(A)(1) of the Ohio Revised Code, a felony of the second degree.

### **SPECIAL FINDING 1**

We, the Jury, do find beyond a reasonable doubt the Defendant, Cory J. Bush, is guilty of failure to stop after an accident and we further find that the accident or collision did/did not (circle one) result in serious physical harm or death to a person.

**SPECIAL FINDING 2**

We, the Jury, do find beyond a reasonable doubt the Defendant, Cory J. Bush, is guilty of failure to stop after an accident and we further find that the defendant did/did not (circle one) know that the accident or collision caused serious physical harm or death of a person.

**{¶59}** Upon review, we find that the Special Finding 1 submitted to and completed by the jury did not require the jurors to unanimously find either 1) that the accident or collision resulted in "serious physical harm" or 2) that it resulted in "death to a person", rather the two were combined together. As such, we are unable to determine which finding the jury made. The same holds true for Special Finding 2 - the form submitted to and completed by the jury did not require the jurors to unanimously find either 1) that the defendant knew that accident or collision caused "serious physical harm" or 2) that it caused the "death to a person". Again, the two were combined together in one finding containing the disjunction "or".

**{¶60}** In the absence of such separate specific findings by the jury, we are unable to determine if the jury returned its verdict on the basis of a finding of "serious physical harm" or "death to a person" in either Special Finding 1 or 2. This Court cannot look into the minds of the jury and determine what evidence they considered to arrive at the verdict.

**{¶61}** Because a finding that the accident resulted in the death of a person and/or that Appellant knew that the accident resulted in the death of a person is necessary to elevate the offense to a third-degree felony or second-degree felony, respectively, we find that the special findings attendant to the verdict form were insufficient.

**{¶62}** As the language of the statute clearly requires said finding to elevate the offense to one of a more serious degree, we find that Appellant herein may only be convicted of the least degree of the offense. Therefore, Appellant can only be convicted of failure to stop after an accident as a felony of the fourth-degree in this case.

**{¶63}** Appellant's assignments of error are sustained.

**{¶64}** Having found error prejudicial to the Appellant, the judgment of the Court of Common Pleas of Licking County is reversed and the matter is remanded for re-sentencing in accord with this opinion.

By: Wise, J.

Gwin, P. J., and

Delaney, J., concur.

_____

HON. JOHN W. WISE

_____

HON. W. SCOTT GWIN

_____

HON. PATRICIA A. DELANEY

JWW/kw 1130